YOUNG, J.
In this appeal, defendant seeks reversal or remittitur of the largest recorded compensatory award for a single-plaintiff sexual harassment suit in the history of the United States. The $21 million verdict awarded, according to plaintiff, barely compensates her for the lasting effects of the sexual harassment she endured as an employee of defendant, DaimlerChrysler, by whom she is still employed and earning almost $100,000 a year. She contended during her trial that defendant’s failure to deal adequately with sexual harassment in her plant led to a permanent change in her “brain chemistry” and a relapse into substance abuse and depression, and that these conditions will soon lead to her untimely and excruciating death.
The foundation for this theory of recovery was laid by the expert opinion testimony of a social worker who had a longstanding relationship with plaintiffs counsel. This witness not only lacked any training, education, or experience in medicine, but also testified falsely about his credentials. Nevertheless, plaintiff asked the jury to treat this witness’s testimony as a “prognosis,” and to *754 compensate plaintiff for the loss of her health and, eventually, her life. Plaintiffs counsel evoked images of physical abuse and torture, compared his client to survivors of the Holocaust, and argued that defendant DaimlerChrysler thought of itself as “God Almighty,” exempt from the legal norms that govern others. Thus, in defendant’s view, the verdict was the product of inflammatory rhetoric, unscientific “expert” testimony, fraud on the court, and attorney misconduct.
We granted leave to appeal in order to determine whether the verdict was a legitimate estimate of plaintiffs losses, as plaintiff contends, or whether it was, as defendant argues, an unjust, excessive award procured through systematic misconduct by plaintiffs trial counsel and supported by dubious evidence. The majority and the dissent agree on one fundamental fact: the verdict rendered in this case is excessive and cannot be affirmed.[1]
*755 A careful review of the record reveals that plaintiffs trial counsel engaged in a sustained and deliberate effort to divert the jury’s attention from the facts and the law. In their stead, counsel interposed misleading argument, prejudice-baiting rhetoric, and pleas for punitive damages. This rhetoric had its intended result: the jury’s verdict unmistakably reflects passion rather than reason and prejudice rather than impartiality.
We conclude that the trial court lacked any justification for denying defendant’s postverdict motion for a new trial under MCR 2.611. Thus, the trial court abused its discretion in denying defendant’s motion for a new trial. We reverse, and we remand to the trial court for further proceedings consistent with this opinion.
I. FACTS AND PROCEDURAL HISTORY
It is undisputed that plaintiff, Linda Gilbert, has long waged a losing battle with substance abuse. Her personal struggles were thoroughly documented in medical records that plaintiff introduced at trial in order to establish damages. According to those records, Ms. Gilbert began drinking at fourteen and began using cocaine at twenty years of age. Most of her adult life has since been marked by excessive drinking. At one point during her employment with defendant, she reported to her substance abuse counselors that she was consuming a pint to one-fifth gallon of alcohol a day. Her cocaine use also continued during her employment with defendant, as documented by records from St. John Hospital and Sacred Heart Rehabilitation Center.
*756 Ms. Gilbert sought professional assistance on a number of occasions and has been treated on both an inpatient and outpatient basis for substance abuse. On the basis of the testimony at trial, however, it appears that none of these treatments has been entirely successful. Indeed, the foundation of plaintiffs claim for $140 million in damages was the assertion that plaintiffs substance abuse would continue until it resulted in her death.
Plaintiffs work life contrasts markedly with her personal difficulties. In the mid-eighties, plaintiff began an apprenticeship to train for a career as a millwright. By 1990, plaintiff had become a journeyman millwright and was hired two years later by the Chrysler Corporation.[2] Plaintiff was the first female millwright to work at Chrysler’s Jefferson North Assembly Plant in Detroit. To our knowledge, plaintiff continues to work for defendant and, according to her attorney, earns “nearly $100,000 per year” with overtime pay.
Plaintiff initiated the present sexual harassment action against defendant on March 25, 1994, complaining that a hostile work environment existed in defendant’s Jefferson North plant. At that time, plaintiff had reported two specific instances of harassment through defendant’s formal discrimination reporting procedure. The first incident took place on May 22, 1993, a little over a year after plaintiff began working for defendant. Plaintiff reported that she found a lewd cartoon taped to her toolbox. It depicted a woman in a bar engaged in an “arm-wrestling” match with a man’s penis. Plaintiffs name was written above the woman in the car *757 toon, and the name of a coworker was written on the man whose penis was being wrestled.[3]
After receiving plaintiffs oral report of this cartoon, plaintiffs supervisor and area coordinator apologized to plaintiff, stated that defendant “did not condone such action” and that they would address the problem by speaking with employees in the area and distributing copies of defendant’s written policy against sexual harassment. Defendant’s internal memo notes that an employee in Chrysler’s human resources department and several other employees spoke with the workers in plaintiffs area and distributed the company’s sexual harassment guidelines following plaintiffs report.
The second reported incident took place on June 5, 1993, when plaintiff found a Polaroid photograph of a penis on her toolbox. She informed her supervisor about the picture. Defendant’s internal memo concerning the complaint indicates that its supervisory employees apologized to plaintiff and reassured her that “[Chrysler did] not approve of such action, and that [Chrysler was] doing everything possible to prevent such harassment.”
On the basis of these two incidents, plaintiff initiated a lawsuit against defendant alleging breach of contract, violations of the Michigan Civil Rights Act, MCL 37.2101 et seq., and negligence in addressing plaintiffs concerns about sexual harassment in the workplace.[4]
*758 After filing her lawsuit, plaintiff formally reported to management several other incidents of harassment that occurred while the suit was pending. Plaintiff reported that, on October 10, 1994, she found a vulgar cartoon entitled “Highway Signs You Should Know” taped to her locker;[5] she also reported that she had found an article by “Dr. Ruth” taped to her locker one week earlier.[6] In response, Maya Baker, a human resources facilitator for defendant, personally patrolled plaintiffs work area on occasion and also asked union leaders to share with union members that the responsible party could be terminated. Next, plaintiff reported that on March 12, 1995, she found a lewd and misogynistic “poem” on a bulletin board in a work area adjacent to hers.[7] Defendant investigated these latter two incidents and, being unable to determine the responsible party, removed the bulletin board.
Finally, on September 2, 1997, plaintiff formally reported that a coworker made references to his “big meat” in front of her. In response to plaintiffs complaint about her coworker’s apparent reference to his genitals, defendant reprimanded the responsible employee.
These are the only sexual harassment incidents that plaintiff made known to defendant through the formal procedures established by defendant for such matters. However, plaintiff contends that defendant had actual *759 notice of other incidents because of her description of those incidents during her deposition testimony given after the commencement of this suit and that defendant had “constructive notice” of other incidents.[8]
Before trial, defendant moved to exclude “evidence regarding incidents that were never reported.” After hearing argument on this motion, the court denied defendant’s request and admitted testimony and evidence on these unreported incidents.
At trial, plaintiff offered the testimony of social worker Carol Katz and of certified social worker and substance abuse counselor Steven Hnat. Mr. Hnat had counseled plaintiff regarding her substance abuse problems before the initiation of her lawsuit against Daim-lerChrysler. He therefore testified as both a fact witness and an expert witness. His testimony proved to be the linchpin of plaintiffs case.
Mr. Hnat opined that the harassment experienced by plaintiff had caused irreversible changes in her brain chemistry, causing her to relapse into alcoholism and to develop “major depressive disorder.” He testified that he had reviewed medical records prepared by other health professionals and, in his opinion, those records read “like a preview of [plaintiffs] death certificate.” He further opined that plaintiffs body was beginning to “decompensat[e],” and that she was “clearly dying.” Mr. *760 Hnat’s theory was that plaintiff would develop a fatal case of pancreatitis, a disease that Mr. Hnat testified was “the most painful way to die.” In the end, he told the jury that plaintiff was likely to die relatively soon because of “medical complications,” and that he “wouldn’t bet on her living very long.”
Thus, plaintiffs theory of the case, as introduced through Mr. Hnat, was that the sexual harassment plaintiff encountered at Chrysler caused a permanent change in her brain chemistry that produced a relapse into alcohol abuse and the onset of depression. These conditions, in turn, would lead inexorably to plaintiffs untimely and excruciating death.
After a six-week trial and 1-1/2 days of deliberation, the jury returned a verdict of $21 million in favor of plaintiff. With prejudgment interest, a judgment for more than $30 million was entered for plaintiff.
On October 29, 1999, defendant moved for judgment notwithstanding the verdict (JNOV), a new trial, remit-titur, an evidentiary hearing, and relief from judgment. The motion argued, among other things, that plaintiffs counsel and Mr. Hnat had perpetrated fraud on the court through misrepresentations about Mr. Hnat’s relationship with plaintiffs counsel and about his academic credentials. Mr. Hnat testified at trial that he received a master’s degree in “psychobiology” from the. University of Michigan, and that, as an undergraduate, he won the prestigious Pillsbury Prize in psychology. These claims were duplicated on a version of Mr. Hnat’s resume that was introduced as a trial exhibit. In fact, both statements were shown after trial to be false. Nevertheless, the trial court denied defendant’s motions on May 1,2000. The Court of Appeals affirmed the jury’s verdict in an unpublished opinion.
*761 On April 8, 2003, we granted defendant’s motion for leave to appeal.[9]
On appeal to this Court, defendant asserts four major claims of error. First, DaimlerChrysler argues that plaintiff failed to state a claim of sexual harassment under the Michigan Civil Rights Act (CRA) because she did not show that defendant’s response to the six reported incidents of sexual harassment was inadequate. Second, defendant argues that it is entitled to a new trial because of the persistent and blatant misconduct of plaintiffs trial counsel. Third, defendant maintains that the trial court committed error requiring reversal by admitting the opinion testimony of a social worker on medical issues and that this error was exacerbated by plaintiffs use of that testimony to inflame the jury. Finally, DaimlerChrysler argues that the $21 million verdict received by plaintiff is so excessive and so clearly punitive that it is entitled to remit-titur.
II. ANALYSIS
A. STANDARD OF REVIEW
A trial court’s decision to grant or deny a motion for a new trial under MCR 2.611 is reviewed for an abuse of discretion.[10] The determination that a trial court abused its discretion “involves far more than a difference in judicial opinion.” [11] Rather, a court abuses its *762 discretion “when ‘an unprejudiced person’ considering ‘the facts upon which the trial court acted, [would] say that there was no justification or excuse for the ruling made.’”[12]
B. DEFENDANT’S MOTION FOR A NEW TRIAL
Defendant moved for postjudgment relief on a number of grounds. One of the grounds was that the verdict was the product of prejudice and passion. According to defendant, plaintiffs counsel had repeatedly equated plaintiffs experiences to those of the victims of the Holocaust, and thereby associated defendant’s new German co-owners with the Nazis who perpetrated that horror. This argument, according to defendant, was bolstered by the expert testimony of a social worker who suggested to the jury that sexual harassment had altered plaintiffs “brain chemistry” and would lead to her untimely and agonizing death. Defendant argued that the excessiveness of the verdict—a $21 million award—palpably reflected the passion and prejudice that plaintiff sought to instill in the jury.
The trial court had the discretion to grant this request for a new trial under MCR 2.611(A)(1), which provides:
A new trial may be granted to all or some of the parties, on all or some of the issues, whenever their substantial rights are materially affected, for any of the following reasons:
(a) Irregularity in the proceedings of the court, jury, or prevailing party, or an order of the court or abuse of discretion which denied the moving party a fair trial.
(b) Misconduct of the jury or of the prevailing party.
*763 (c) Excessive or inadequate damages appearing to have been influenced by passion or prejudice.
(d) A verdict clearly or grossly inadequate or excessive.
(e) A verdict or decision against the great weight of the evidence or contrary to law.
(f) Material evidence, newly discovered, which could not with reasonable diligence have been discovered and produced at trial.
(g) Error of law occurring in the proceedings, or mistake of fact by the court.
An objective review of the proceedings below leads to the conclusion that the trial court abused its discretion in failing to grant a new trial under MCR 2.611(A)(1)(c). The jury verdict is so excessive and so clearly the product of passion and prejudice that there can be no justification for the trial court’s denial of defendant’s motion for a new trial.
1. AN “EXCESSIVE” VERDICT
In order to grant relief under MCR 2.611(A)(1)(c), it is first necessary to determine whether the verdict is “excessive.” Because subsection c does not define this term, it must be given its “plain and ordinary meaning[].”[13] “Excessive” is defined as “going beyond the usual, necessary, or proper limit or degree; characterized by excess.”[14] In the context of compensatory damages, the determination whether damages exceed the “necessary or proper limit” is no simple task. “[T]he authority to measure damages,” as we stated in Kelly v Builder’s Square, “inheres in the jury’s role as trier of fact.”[15] Because the amount required to compensate a *764 party for pain and suffering is imprecise, that calculation typically belongs to the jury.[16]
The difficulty of reviewing damage awards, however, does not undermine the judicial obligation to do so under MCR 2.611. A reviewing court is therefore faced with the task of ensuring that a verdict is not “excessive” without concomitantly usurping the jury’s authority to determine the amount necessary to compensate an injured party. Given the impossibility of using a simple algorithm for this task, judicial review of compensatory awards must rely on the fundamental principle behind compensatory damages—that of recompensing the injured party for losses proven in the record.
This, in effect, is the rationale behind three of the four factors that a majority of this Court endorsed in Palenkas v Beaumont[17] The Palenkas majority stressed that appellate review of jury verdicts must be based on objective factors and firmly grounded in the record.[18] Accordingly, judicial review of purportedly excessive jury verdicts should focus on the following objective factors:
whether the verdict was the result of improper methods, prejudice, passion, partiality, sympathy, corruption, or mistake of law or fact; [2] whether the verdict was within the limits of what reasonable minds would deem just compensation for the injury sustained; [and 3] whether the amount actually awarded is comparable to awards in similar cases within the state and in other jurisdictions.[19]
*765 When a verdict is procured through improper methods of advocacy, misleading argument, or other factors that confound the jury’s quantification of a party’s injuries, that amount is inherently unreliable and unlikely to be a fair estimate of the injured party’s losses. Likewise, when a verdict is unsupported by the record or entirely inconsistent with verdicts rendered in similar cases, a reviewing court may fairly conclude that the verdict exceeds the amount required to compensate the injured party.
When analyzing a verdict according to the Palenkas factors, courts must be mindful of the fact that punitive damages are available in Michigan only when expressly authorized by the Legislature.[20] Here, the Civil Rights Act does not authorize punitive damages—and, moreover, permits compensation only for “injury or loss caused by each violation of this act, including reasonable attorney’s fees.”[21] Thus, the court has a statutory obligation under the CRA to ensure, through consideration of the objective factors described by Palenkas, that this damage award serves the ends articulated by the Legislature.[22]
*766 We turn first to the question “whether the verdict was the result of improper methods, prejudice, passion, partiality, sympathy, corruption, or mistake of law or fact... ,”[23] As shown in greater detail in Part 11(B)(2), we have concluded that this verdict was the product of misleading argument, inflammatory rhetoric, and the improper admission of expert opinion testimony utterly lacking in scientific support.[24] The first Palenkas factor listed above therefore provides strong support for the conclusion that this verdict is “excessive,” as that term is used in MCR 2.611(A)(1)(c).
The second Palenkas factor addresses “whether the verdict was within the limits of what reasonable minds would deem just compensation for the injury sustained .. ,”[25] This inquiry into the reasonableness of the verdict concerns, in essence, whether the verdict is supported by the record. Here, it is apparent that the jury verdict is unsupported by the evidence in one sense. The jury awarded plaintiff $1 million in trust for future medical expenses and “loss of future earning capacity,” despite the fact that plaintiff failed to demonstrate any economic harm in the present, much less a “loss of future earning capacity.” In fact, according to her counsel, plaintiff continues to earn almost $100,000 a year with overtime pay as an employee of defendant. Similarly, there was no evidence regarding the nature of *767 medical treatment that plaintiff may have to undergo in the future or the likely cost of that treatment. The jury’s estimation of plaintiffs future economic loss was without support in the record.
The remainder of the verdict—$20 million—was intended to compensate plaintiff for emotional distress, “physical pain and suffering,” and the aggravation of her substance abuse. There may be some cases in which it is possible to determine objectively that a compensatory award is or is not supported by the record. But this determination is extremely problematic where damages for emotional distress are at issue. In such cases, comparison with damage awards in comparable cases in this jurisdiction and beyond—the final Palenkas factor —becomes most relevant. While the resultant analysis is certainly imperfect, other damage awards may provide a range of what constitutes reasonable compensation for the type of injury suffered by a plaintiff. With this range in mind, the reviewing court may determine whether the verdict appears to be “within the limits of what reasonable minds would deem just compensation for the injury sustained .. . ,”[26]
Turning finally to the third Palenkas factor, the $21 million verdict awarded in this case is far beyond the range of what other juries have determined to be reasonable compensation for injuries similar to—and much worse than—those suffered by plaintiff. To our knowledge, plaintiffs $21 million verdict is the largest amount ever awarded for a single-plaintiff sexual harassment claim in the United States. It is seventy times larger than the maximum award permitted under title VII, the federal civil rights act.[27] Indeed, plaintiff has not cited a single compensatory verdict in an employ *768 ment discrimination action from any court within the United States that arguably rivals the amount awarded to plaintiff.
In responding to defendant’s argument that the $21 million verdict is “the largest single-plaintiff sexual harassment award upheld on appeal anywhere in the entire country,” plaintiff has argued to this Court:
Defendant’s “other sexual harassment” case analysis is far from honest. Looking only at automobile companies, and ignoring every other case of sexual harassment in any other field of employment in the Country, the largest recovery is a $34,000,000 settlement by Mitsubishi in June of 1998.. .. While Daimler Chrysler may believe that sexual harassment of women is acceptable and insignificant, other automobile manufacturers recognize their responsibilities and the gravity of injury by agreeing to high seven and eight figure settlements to avoid the higher measure of full redress available to a victim like Linda Gilbert who recovers for all losses at trial.
Plaintiffs attack on defendant’s “dishonesty” here omits a crucial fact: Mitsubishi’s $34 million settlement was in a class action.[28]’ We are unaware, therefore, of any single-plaintiff employment discrimination verdict involving a nonpunitive award that even arguably approaches the amount awarded to plaintiff, and plaintiff has identified none.
Plaintiff argues that this discrepancy between her verdict and every other sexual harassment verdict in the United States simply reflects the jury’s recognition that defendant’s conduct was much, much worse than that of any other defendant in a sexual harassment case. While we have no doubt that plaintiff encountered *769 truly ugly conduct at Chrysler given the evidence and testimony adduced at trial, we cannot accept the argument that plaintiffs was the worst case of sexual harassment in the history of the country that has resulted in a verdict.
A survey of verdicts rendered in other sexual harassment suits reveals that plaintiffs who endure sexual harassment in its most aggressive form—unwanted touching and persistent, predatory sexual advances— uniformly have received far less in compensatory damages than the amount awarded to plaintiff. For example, in Griffin v City of Opa-locka, a party who alleged that she was sexually harassed during a four-month period and was raped by her manager was awarded $2 million.[29] And in Grow v WA Thomas Co, the plaintiff alleged that she was subjected to “sexually explicit comments and unwanted kissing and groping” over several years and recovered $192,684.[30]
Indeed, the only plaintiffs who have recovered sexual harassment verdicts that are even arguably comparable to that rendered in this case are those who recovered punitive damages.[31] Even among cases in which a plaintiff recovered punitive damages for sexual harassment, our research discloses no case in which a party recov *770 ered a punitive award that approached or exceeded $21 million that was upheld on appeal.[32]
On the basis of three of the factors articulated by this Court in Palenkas, we conclude that the verdict in this case is “excessive” as that term is used in MCR 2.611. Not only does the verdict exceed verdicts in similar cases by leaps and bounds, but, as shown in this opinion, it was awarded by a jury inflamed by hyperbolic rhetoric, prejudice-baiting argument, and unscientific expert testimony.
2. PASSION AND PREJUDICE
Having determined that the verdict is excessive, we also conclude excessiveness may be attributed to the effect of plaintiffs efforts to cause the jury to act on passion and prejudice. An objective review of the record leads to an unavoidable conclusion: plaintiffs counsel engaged in a systematic effort to divert the jury from its true task—that of appropriately compensating the plaintiff for any losses suffered as a result of defendant’s violation of the CRA—and instead sought to inflame passion and to incite the jury to punish the defendant even while disclaiming that he was seeking punitive damages.
Plaintiffs counsel deliberately tried to provoke the jury by supplanting law, fact, and reason with prejudice, misleading arguments, and repeated ad hominem attacks against defendant based on its corporate status. *771 Given the undeniable role of this inflammatory rhetoric, the trial court erred in denying defendant’s motion for a new trial.[33]
One of counsel’s tactics in this vein was his repeated attempts to equate plaintiff with the victims of the Holocaust. This association began during the testimony of plaintiffs expert, Steven Hnat, when Mr. Hnat testified that plaintiffs psychological state was akin to that of concentration camp survivors. Plaintiffs counsel further developed this theme during his closing argument:
Never again. Never again. That is a line now used by the sabreurs [sic; sabras] in Israel, the land of Israel, to mean that the unspeakable horrors that were perpetrated on the people of Israel, on the Jews, must never be forgotten and must never happen again. Never again. Never again.
Counsel also exhorted the jury to
provide full and complete justice and thereby, as I indicated at the start of this trial, raise the roof of this courthouse so that justice will ring loud and clear. No more.
As those young [sabras] said in the land of Israel, no more. We will not let this stand. We will not allow this to pass. We will not allow you, you, an equal with all of us in this, the great equalizer, to crush the health and the dreams of a woman who simply had the American dream.
Even the final sentence of plaintiffs closing argument referenced the Holocaust theme: “Let’s bury this prejudice once and for all so that we may appropriately say, never again.”
*772 This recurring rhetorical theme was especially virulent given the context of plaintiffs trial. In 1998, Chrysler had merged with Daimler Benz AG, a German automobile manufacturer. The merger was highly publicized—particularly in metropolitan Detroit, where plaintiffs trial was held. And if any of the jurors had failed to hear about the merger through media outlets, they were privy to the news once plaintiffs counsel pointed out during his closing argument that Chrysler was under German ownership:
Daimler-Chrysler may be powerful, but, my God, they are going to have to recognize, hopefully today by your verdict, that not only must they face justice in this case, they must obey the law.
We are a nation of laws, not powerful individuals. We are a nation of laws ...
And, I can assure that verdict will be heard from the floor of that plant on Jefferson to the board room in Auburn Hills or Stuttgart. .. .
Once they hear in Auburn Hills and in Germany about Linda ... it will stop.
Continuing on this theme, counsel argued that the jury now had a chance to acquaint Chrysler’s German owners with a distinctly American brand of justice:
[You must] ring that bell of justice even if you have to have it rung across the oceans of this land to their board rooms, wherever they may be.
Chrysler must take notice that it is responsible, under the Constitution and laws of this state, and that we are ringing the bell of justice so that she can walk a little taller and stand a little prouder.
Thus, counsel’s closing argument had a clear rhetorical aim of making defendant’s German ownership a critical issue in the minds of the jurors. By associating plaintiff with those who had endured inhuman treat *773 ment in concentration camps, counsel likened defendant DaimlerChrysler—which, as the jury was informed, was partially under German ownership—with the Nazis. This argument was an attempt to incite the jury to heap upon the defendant the moral outrage that is now reserved for the Nazis and those who assisted them in carrying out the Holocaust. It was, in other words, a naked appeal to passion and prejudice and an attempt to divert the jury from the facts and the law relevant to this case.
Besides associating defendant with one of the most destructive and inhumane forces in modern history, counsel attempted artfully to convince the jury that defendant itself had physically harmed plaintiff, when there was no record of physical injury in the record. In describing plaintiffs refusal to quit her position as a millwright, counsel argued:
She stayed. She was not going to give up. You could kick her. You could torture her. You could harass her. You could put her in hospitals, but she was going to claw. She was going to hold on. She was going to do whatever was necessary to not lose that last shred of humanity that made her pull—that constitutes the soul, the thread, that will live on forever after she is gone. [Emphasis added.]
Plaintiffs counsel also equated plaintiff with a dog that had been kicked, beaten, and physically abused on a daily basis. Although counsel was quick to point out that he was not saying that plaintiff was actually a dog, he failed to mention that there was absolutely no evidence that plaintiff had been physically abused in any way by any employee of defendant.
Plaintiffs counsel also played on prejudice against corporations, arguing that DaimlerChrysler thought that it did not have to obey the law simply because of its corporate status:
*774 You [defendant] are not God Almighty sitting on the mountain. You are not Zeus ....
We will hold you to the same standard we will hold to anyone else, because their attitude speaks volume [sic] of their belief that they are above being held to the same standard as a lowly woman millwright would be held to.
Later, plaintiffs counsel argued:
[Apparently ... when you enter the confines of a multi, a very, very successful business over on Jefferson, that the laws of civility don’t apply.
That they are... permitted under the laws and the Constitution of this state to be less civil and less respectful of civil rights... . They think, they must think that it is okay with you that this type of thing went on day after day. That it was okay to treat a woman the way Linda was treated.
That it was okay with you that they tried to take away a woman’s livelihood, the first and only female millwright ever employed at that plant. That it is okay to humiliate and degrade a woman as she tries to earn and do her best[.]
Equally telling is counsel’s argument that “[plaintiff was] discriminated against twice, because she is not Lee Iacocca. She is just a millwright.”
There was no evidence presented at trial suggesting that anyone employed by defendant thought incorporation relieved it of the obligation to follow the law. Nor was there evidence that anyone in the management of DaimlerChrysler approved of sexual harassment or would have responded differently had a corporate officer been the subject of sexual harassment.
These arguments were little more than pleas for the jury to consider defendant’s corporate status rather than its true liability under the CRA. However justifiable *775 counsel’s moral indignation over the treatment plaintiff encountered while working for DaimlerChrysler, that indignation does not and cannot justify rhetoric that attempts to inflame passion and prejudice and that intentionally subverts the jury’s fact-finding role.
Finally, plaintiffs counsel attempted to inject passion and prejudice into the adjudication of this matter by deliberately and repeatedly using language that calls for punitive rather than compensatory damages. A number of these pleas for punitive damages have already been cited. One request for punitive damages was particularly overt:
You must consider the days, the minutes, the hours, and the weeks that she went through for seven years, and for as long as God gives her on this plant [sic], God help her, and allows her to maintain on this plant [sic], despite the disease that she is suffering from, the diseases that she will suffer from, and that will kill her, you must consider that, and so that your verdict reflect the enormity of the wrong, the intolerable nature of the injury, the extent of the humiliation, the torture, the extent of the outrage perpetrated upon, I can suggest, and you can go back in your jury room, and you determine whether this is right. That is should be more, that it should be less.
But I suggest to you that you award as full and complete justice for the seven years of past and for the future, whatever it holds, $140,000,000.00. You can break that any way you want....
[T]he hopes and dreams of all free Americans exist in Linda the way they do in all of us.
And to destroy those, and to subject anyone to the type of indignity and injustice and intolerable acts that this woman has been subjected to for the past seven years, that figure reflects a symbol, if you will, since you can’t adequately compensate her for every....
*776 This soliloquy stopped briefly only when defense counsel objected to this use of punitive damages rhetoric and the court gave a curative instruction.
The verdict rendered by the jury, however, showed that the damage had been done—that counsel’s inflammatory rhetoric had its intended effect. Instead of awarding plaintiff an amount that fully and fairly compensated her, the jury returned a verdict that responded to plaintiffs request that they “send a message” to Chrysler.
Counsel’s persistent and deliberate efforts to incite passion and prejudice distinguish this case from those in which inflammatory remarks were fleeting and unintentional.[34] Plaintiffs counsel has been admonished in two published Court of Appeals opinions since this trial for precisely the same sort of hyperbolic and vitriolic argument he made on behalf of Linda Gilbert.[35] *777 Overreaching, prejudice-baiting rhetoric appears to be a calculated, routine feature of counsel’s trial strategy. This deliberate use of improper argument, coupled with the astonishingly excessive verdict rendered against defendant, precludes us from concluding that counsel’s misconduct was “innocuous” and “unintended.”
In fact, plaintiffs counsel’s behavior during trial is remarkably similar to what necessitated a new trial in Reetz v Kinsman Marine Transit Co.[36] The plaintiff in Reetz was injured when he fell into an open hatch while working as a deckhand. The vessel on which the plaintiff sustained his injuries was owned by Kinsman Marine Transit Company, and George Steinbrenner, III, served as chairman of the board for Kinsman’s parent company. Reetz’s counsel made Kinsman’s corporate status an issue at trial, arguing that Kinsman “cared nothing about Reetz’s welfare ... .”[37] Further, Reetz’s counsel made “repeated references” to Mr. Steinbren-ner, despite the fact that Mr. Steinbrenner had no personal involvement in the case.[38] We concluded in Reetz that
[t]he effect of these comments was to create in the minds of the jurors an image of Kinsman as an unfeeling, powerful corporation controlled by a ruthless millionaire. Even a juror who harbored no prejudice against corporations or millionaires might have been swayed by these inflammatory remarks to alter his view of the evidence.[39]
*778 On the basis of counsel’s ad hominem attacks against the defendant and his numerous references to multimillion dollar verdicts in other cases, we concluded that the jury had been incurably tainted and a new trial was necessary.[40]
The parallel to arguments made by plaintiffs counsel in this case is striking. Here, however, the anticorporate rhetoric was even less subtle than that supporting a new trial in Reetz.[41] And instead of referring to other multimillion dollar verdicts, counsel repeatedly utilized language calling for punitive damages.[42] Therefore, we conclude that
“[t]he record in the instant case shows a deliberate course of conduct on the part of counsel for plaintiff aimed at preventing defendant from having a fair and impartial trial. We think the course of misconduct was so persistently followed that a charge of the Court in an effort to obviate the prejudice would have been useless.”[43]
When faced with defendant’s motion for postjudgment relief under MCR 2.611, the trial court had no reason to deny relief and every reason to grant it. In making its ruling on defendant’s posttrial motions, the trial court clearly ignored the prominence of prejudicial rhetoric in plaintiffs closing argument and the effect that this rhetoric had on the jury.
The trial court’s failure to grant a new trial was, therefore, an abuse of discretion. We reverse the judg *779 ment of the Court of Appeals and remand this action to the circuit court for proceedings in accordance with this opinion.
C. MRE 702 & THE EXPERT OPINION TESTIMONY OF STEVEN HNAT
In order to provide guidance for the new trial, we address the controversy surrounding the expert testimony and the erroneous standard propounded by the Court of Appeals concerning the gate keeping role required by MRE 702. We now clarify that MRE 702 requires the trial court to ensure that each aspect of an expert witness’s proffered testimony—including the data underlying the expert’s theories and the methodology by which the expert draws conclusions from that data—is reliable.
1. THE COURT’S GATEKEEPER ROLE UNDER MRE 702
MRE 702, as it existed at the time of trial,[44] provided:
If the trial court determines that recognized scientific, technical, or other specialized knowledge will assist the *780 trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.
In both its former and current incarnations,[45] MRE 702 has imposed an obligation on the trial court to ensure that any expert testimony admitted at trial is reliable.[46] While the exercise of this gatekeeper role is within a court’s discretion, a trial judge may neither “abandon” this obligation nor “perform the function inadequately.”[47]
Indeed, the obligation imposed by MRE 702 is reinforced by MRE 104(a), which provides that “[preliminary questions concerning the qualification of a person to be a witness... shall be determined by the court. .. .”[48] The requirements of MRE 104(a) extended to the application of MRE 702 because the *781 admission of expert testimony under this rule hinges on preliminary questions concerning qualification. For example, reference in MRE 702 to “scientific” evidence “implies a grounding in the methods and procedures of science,” and the rule’s reference to “knowledge” “connotes more than subjective belief or unsupported speculation.”[49] As such, MRE 104 requires the trial court to address these preconditions before admitting expert testimony.
It is well-established that the proponent of evidence “bears the burden of establishing relevance and admissibility.”[50] At the time this case was tried, the proponent of expert opinion evidence bore the burden of establishing admissibility according to the Davis-Frye “general acceptance” standard.[51] MRE 702 has since been amended explicitly to incorporate Daubert’s standards of reliability. But this modification of MRE 702 changes only the factors that a court may consider in determining whether expert opinion evidence is admissible. It has not altered the court’s fundamental duty of ensuring that all expert opinion testimony—regardless of whether the testimony is based on “novel”[52] science—is reliable.
*782 Thus, properly understood, the court’s gatekeeper role is the same under Davis-Frye and Daubert.[53] Regardless of which test the court applies, the court may admit evidence only once it ensures, pursuant to MRE 702, that expert testimony meets that rule’s standard of reliability. In other words, both tests require courts to exclude junk science; Daubert simply allows courts to consider more than just “general acceptance” in determining whether expert testimony must be excluded.
This gatekeeper role applies to all stages of expert analysis. MRE 702 mandates a searching inquiry, not just of the data underlying expert testimony, but also of the manner in which the expert interprets and extrapolates from those data. Thus, it is insufficient for the proponent of expert opinion merely to show that the opinion rests on data viewed as legitimate in the context of a particular area of expertise (such as medicine). The proponent must also show that any opinion based on those data expresses conclusions reached through reliable principles and methodology.[54]
Careful vetting of all aspects of expert testimony is especially important when an expert provides testimony about causation.[55] The United States Supreme Court’s caveat in Joiner is persuasive:
*783 [N]othing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the ipse dixit of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.[56]
When a court focuses its MRE 702 inquiry on the data underlying expert opinion and neglects to evaluate the extent to which an expert extrapolates from those data in a manner consistent with Davis-Frye (or now Daub-ert), it runs the risk of overlooking a yawning “analytical gap” between that data and the opinion expressed by an expert.[57] As a result, ostensibly legitimate data may serve as a Trojan horse that facilitates the surreptitious advance of junk science and spurious, unreliable opinions.
2. MR. HNAT’S MEDICAL OPINION TESTIMONY
Both the trial court and the Court of Appeals seem unaware of the core gatekeeper principles described above. As a result, the faux “medical” opinion of an individual who lacked any medical education, experience, training, skill, or knowledge became the linchpin of plaintiffs case and unmistakably affected the verdict.
Plaintiffs theory at trial was that the sexual harassment she encountered as defendant’s employee had produced a permanent change in her “brain chemistry,” that this neurological change led to an increase in substance abuse and that, in the end, defendant’s failure to curb sexual harassment in plaintiffs workplace would cause her to die the most painful death imaginable because of the metabolic physiological phe *784 nomena he described.[58] The theory was presented through the testimony of Mr. Hnat, a social worker, and was based on his analysis of medical records from various hospitals and clinics where plaintiff was treated for substance abuse.
Mr. Hnat testified that he was a certified social worker with experience in substance abuse treatment.[59] He also testified that he had received a master’s degree in psychobiology, although it was revealed after trial that this testimony was patently false.[60]
*785 Apparently influenced by Mr. Hnat’s claim to have expertise in psychobiology, the trial court permitted plaintiff to introduce medical records through Mr. Hnat’s testimony. Before the admission of records from Sacred Heart Rehabilitation Center, defense counsel raised the following objection:
Your Honor, I object to their admission. Certainly, with regard to this witness, he is not a medical doctor to review all of these other records and testify about them. He is a social worker and he is competent to testify about his own records.
It is just not appropriate. The foundation hasn’t been laid for the introduction of those records, certainly not pursuant to this individual.
The trial court rejected defendant’s argument that Mr. Hnat was unqualified to articulate an opinion based on records compiled when plaintiff sought treatment for substance abuse. However, the record in this case reveals that, irrespective of whether the medical records detailing plaintiffs substance abuse treatment were admissible, Mr. Hnat was asked to interpret those records and thereby render an opinion that he was wholly unqualified to give.
For example, the following exchange took place during plaintiffs direct examination of Mr. Hnat:
*786 Q. Will [plaintiff] be able to work in light of what you know about her condition as recently as yesterday? Will she continue to be physically able to work?
A. No. Her medical complications at this point have progressed to the point where she is going to be physically unable to work fairly soon.
She is going to have increasing hospitalizations most likely to deal with the cirrhosis, the pancreatitis, she may need transplants at some point, she may need any range of radical medical intervention. So her ability to work physically is severely impaired at this point even though right now she is functioning okay. There is going to be increasing problems associated with this medical condition. It’s unavoidable. People have those severe complications must work [sic],
Q. Do you have any idea what was the cause of her problems as they exist in this lady as late as yesterday?
A. Alcoholism, major depression precipitated by work stresses, and sexual harassment. That is the bottom line.
Q. What do you mean that is the bottom line?
A. I mean that is what happened here, that is what is killing this person, probably has killed her as far as you can tell at this point. 1 wouldn’t bet on her living very long. She might, if she gets treatment. There’s a chance. If she doesn’t get treatment, she’ll die fairly soon. [Emphasis added.]
The impact of Mr. Hnat’s “medical opinion” on the verdict rendered in this case could not have been more pronounced. Especially noteworthy is the fact that, during closing arguments, plaintiffs counsel encouraged the jury to treat Mr. Hnat’s opinion as an actual medical prognosis:
You heard testimony, and I don’t think Mr. Hnat was being glib when he testified about the fact that although he is not an omniscient, he is not a sooth sayer, he has read her death certificate.
Her death certificate, her death will come sooner or later, none of us can know for sure. You will consider this in *787 a haze of alcohol. She will die either in a violent event if she drives, or she will die of the effects of alcohol on her body. She will have chronic hepatitis, in other words, a disease of the liver, cirrhosis, if you will. She will have dehydration as Mr. Hnat testified to. She will have metabolic acidosis that will slowly put her into a coma.
She will have increased red hlood cells, or low blood cells to fight infection. She will have chronic pancreatitis. One of the most painful diseases known to medical science, inflammation of her pancreas. And she has suffered all of these during hospitalizations, as Mr. Hnat has testified to.
She will suffer severe abdominal pain, and she will die. And she will not live out her life.
At one point during closing arguments, plaintiffs counsel even told the jury that plaintiff had to leave the courtroom for a portion of his closing argument because the “prognosis that she has for her life” was too grim for her to hear.[61]
As these excerpts reveal, Mr. Hnat unquestionably used the content of plaintiffs treatment records to render an opinion that required medical expertise. He speculated about plaintiffs impending physical inability to work, testified about the type of medical complications that plaintiff would soon experience, predicted the cause of her death, and gave testimony concerning plaintiffs life expectancy. Mr. Hnat expressed his “opinion” on physiological disease, cause of death, and plaintiffs lifespan. Yet there was no evidence or showing that Mr. Hnat was qualified by training, experience, or knowledge to render such opinions or interpret medical *788 records that would arguably support such a diagnosis or prognosis. There was, in other words, no evidence that Mr. Hnat was qualified to testify that defendant’s actions concerning workplace harassment caused neurological and physiological changes in plaintiff and shortened her life.
Plaintiffs arguments in support of Mr. Hnat’s testimony and the Court of Appeals’ acceptance of those arguments can be based only on a misinterpretation of MEE 702. Plaintiff argued, for example, that Mr. Hnat was qualified to interpret plaintiffs medical records because he is a “treater.” In order for Mr. Hnat to provide an admissible opinion interpreting medical records for purposes other than those related to the expertise of social workers, plaintiff bore the burden of showing that Mr. Hnat was qualified by knowledge, skill, experience, training, or education in medicine. Given the absence of such evidence, plaintiff failed to carry the burden of establishing the admissibility of Mr. Hnat’s medical opinions, regardless of the admissibility of the records that ostensibly informed this opinion.
Likewise, we reject the Court of Appeals’ argument that “the ‘mere fact’ that Mr. Hnat ‘is not a medical practitioner does not render him unqualified as an expert witness’ ” because “[a]ny limitations in” Mr. Hnat’s “qualifications are relevant to the weight, not the admissibility, of his testimony.”[62] The Court of Appeals’ observation that one need not be a medical practitioner to testify as an expert is little more than a truism. And we do not disagree with the proposition that, in some circumstances, an expert’s qualifications pertain to weight rather than to the admissibility of the *789 expert’s opinion.[63] That is not to say, however, that any issue of qualification relates to weight rather than admissibility.
As shown, MRE 702 establishes preconditions for the admission of expert opinion. Such testimony must be rooted in “recognized scientific, technical, or other specialized knowledge” and must assist the trier of fact. The burden is on the party offering the expert to satisfy the preconditions established by MRE 702.[64]
Where the subject of the proffered testimony is far beyond the scope of an individual’s expertise—for example, where a party offers an expert in economics to testify about biochemistry—that testimony is inadmissible under MRE 702. In such cases, it would be inaccurate to say that the expert’s lack of expertise or experience merely relates to the weight of her testimony. An expert who lacks “knowledge” in the field at issue cannot “assist the trier of fact.”
Here, according to plaintiffs counsel, Mr. Hnat gave plaintiff a “prognosis” on the basis of his interpretation of records from medical and treatment facilities. The medical “prognosis” of a social worker who has no training in medicine and lacks any demonstrated ability *790 to interpret medical records meaningfully is of little assistance to the trier of fact.
We also reject the Court of Appeals’ assertion that Mr. Hnat’s medical testimony on the physiological effects of alcoholism and depression was admissible because these effects are “common knowledge.”[65] As the United States District Court for the Eastern District of Michigan has aptly stated:
[Ejxpert testimony is not admissible unless it will be helpful to the fact finder. Such testimony is unhelpful when it is unreliable or irrelevant, as the [Supreme] Court observed in Daubert,.. . and also when it merely deals with a proposition that is not beyond the ken of common knowledge[66]
To justify the admission of an expert opinion on the basis of the belief that no expertise is necessary to render such an opinion is to fail to give any effect to MRE 702, and, indeed, to turn that rule on its head. The previous MRE 702 allowed expert opinion testimony only “[i]f the trial court determines that recognized scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue . . . .” Thus, the Court of Appeals panel’s rationalization that Mr. Hnat’s expert opinion testimony was harmlessly admitted because it was based on “common knowledge” is inconsistent with the requirements of MRE 702.
Unless information requiring expert interpretation actually goes through the crucible of analysis by a qualified expert, it is of little assistance to the jury and therefore inadmissible under MRE 702. We direct the *791 trial judge on retrial to ensure that expert opinion testimony meets the purpose expressed in MRE 702— that of assisting the trier of fact through the introduction of reliable “scientific, technical, or other specialized knowledge.”
D. THE SUFFICIENCY OF PLAINTIFF’S CLAIM UNDER THE CRA
We turn finally to defendant’s claim that the trial court erred by admitting evidence regarding incidents of sexual harassment of which defendant was never properly notified. Defendant moved in limine to exclude incidents that plaintiff reported for the first time at her deposition. The court denied that motion, concluding that the jury could consider each incident in order to determine whether defendant had actual or constructive notice that plaintiff was subjected to a hostile environment. The Court of Appeals employed a similar logic in concluding that each incident was admissible.
While the trial court did not err in denying defendant’s motion to exclude those incidents,[67] this ruling has resulted in substantial confusion. We now clarify the legal justification for the trial court’s decision in order to minimize confusion during retrial.
Under the Civil Rights Act, an employer may be liable for an employee’s sexual harassment when the employer has notice of the harassment and fails to take *792 appropriate corrective action.[68] In Chambers, we held that “notice of sexual harassment is adequate if, by an objective standard, the totality of the circumstances were such that a reasonable employer would have been aware of a substantial probability that sexual harassment was occurring.”[69]
When a plaintiff describes an incident of sexual harassment for the first time at her deposition, evidence pertaining to that incident may be admissible under two rationales. First, such evidence may be admissible in order to establish the nature and extent of the hostile environment to which the plaintiff was subjected and the adequacy of the defendant’s response upon being notified about sexual harassment. Second, that evidence may be admissible under a “constructive notice” theory when a plaintiff contends that sexual harassment was so pervasive that her employer should have known of the need for corrective measures.[70]
In this case, plaintiff gave actual notice to defendant through defendant’s formal reporting procedures before initiating this lawsuit. Any incidents that she described for the first time at her deposition were admissible in order to establish an element of her hostile environment claim—that “the unwelcome sexual conduct or communication was intended to or in fact did substantially interfere with the employee’s employment or created an intimidating, hostile, or offensive work environment, ”[71]—and to establish the inadequacy of defendant’s response to that hostile environment. Therefore, the circuit court did not err by *793 denying defendant’s motion to exclude evidence of any incident that plaintiff described for the first time at her deposition.
III. CONCLUSION
For the foregoing reasons, we conclude that the trial court abused its discretion in denying defendant’s motion for a new trial under MCR 2.611. Once the jury issued its verdict, it should have been apparent to the trial court that the persistent and calculated efforts of plaintiffs trial counsel to thwart the jury’s fact-finding role had borne fruit. The jury’s deliberations had been palpably affected and this wrought substantial harm to defendant’s right to a fair trial. This case is remanded to the Wayne Circuit Court for a new trial to be held consistently with this opinion.
Corrigan, C.J., and Taylor and Markman, J., concurred with Young, J.

 We differ not, as the dissent suggests, because we believe that the plaintiff has failed to make out a case of sexual harassment worthy of a verdict. We differ instead because we believe that this verdict is excessive and because we have concluded that the record supporting this verdict is the result of plaintiffs counsel’s repeated invitation to the jury to exercise its collective prejudices in preference to fairly compensating plaintiff on the evidence presented. For all of the reasons detailed in this majority opinion, we conclude that the repeated, explicit and inappropriate references to the Holocaust, defendant’s German national origin, and defendant’s status as a corporation cannot be tolerated in Michigan courts any more than in our society at large.
The people have declared in our Constitution that “equal protection of the laws” shall not be denied on the basis of national origin. Const 1963, art 1, § 2. See, also, the Michigan Civil Rights Act, MCL 37.2101 et seq. The observance of this fundamental principle cannot stop at the door of the courthouse. Indeed, it is within the courthouse that we ought be most concerned that the merits of a party’s cause, not its alienage or status, should remain the exclusive focus of a jury’s deliberations. Thus, while we hold no brief for the inadequacies of defendant’s counsel that the dissent has taken pains to note, defendant was entitled to a trial free of *755 naked appeals to entice the jury to consider its passions and prejudice rather than the evidence.

 Chrysler was a corporate predecessor of defendant DaimlerChrysler. In 1998, Chrysler merged with Daimler Benz AG to form Daimler-Chrysler. DaimlerChrysler is the named defendant in this action.

 When plaintiff described the cartoon in a written report requested by defendant, she wrote that “[t]he woman was bare-breasted and about to perform fellatio. I was named as the woman. I was extremely insulted and degraded. The insinuation that this happens between myself and a man I work with everyday is humiliating.”

 The breach of contract and negligence claims were omitted from the pretrial order and were not presented to the jury.

 The cartoon contains a number of lewd drawings, each apparently meant sexually to illustrate “highway signs” such as “Dead End” and “Men at Work.”

 The article by columnist Dr. Ruth Westheimer was a response to a man complaining that his penis was sore from having sexual intercourse too frequently.

 The “poem” is reproduced in the Court of Appeals’ opinion. Unpublished opinion per curiam, issued July 30, 2002 (Docket No. 227392), pp 6-7.

 Plaintiff testified, for example, that on her first day of work a coworker mentioned that he would like to hold a ladder for plaintiff if she were wearing a dress; that a coworker called her a “bitch” during a card game; that her toolbox was “blocked” when coworkers intentionally placed other equipment in front of it; that some coworkers ignored her or made false claims in order to get her in trouble with management; that a misogynistic cartoon was taped to her toolbox with the word “bitch” written on the tape; that a Penthouse article called “Why Men Have So Many Sperm” was set on a table next to her beverage; and that a liquid—which plaintiff now asserts was urine—was found on her chair.

 468 Mich 883 (2003). We also granted motions from the Michigan Chamber of Commerce and the United States Chamber of Commerce to file briefs amicus curiae, and solicited additional briefs amicus curiae from interested parties.

 Kelly v Builders Square, Inc, 465 Mich 29, 34; 632 NW2d 912 (2001).

 Alken-Ziegler, Inc v Waterbury Headers Corp, 461 Mich 219, 227; 600 NW2d 638 (1999).

 People v Hendrickson, 459 Mich 229, 235; 586 NW2d 906 (1998) (opinion by Kelly, J.), quoting Detroit Tug & Wrecking Co v Wayne Circuit Judge, To Mich 360, 361; 42 NW 968 (1889).

 Koontz v Ameritech Services, Inc, 466 Mich 304, 312; 645 NW2d 34 (2002).

 Random House Webster’s Unabridged Dictionary (2001).

 Id. at 34.

 Id. at 35.

 432 Mich 527, 533; 443 NW2d 354 (1989).

 Id. at 532-33.

 Id.

 Rafferty v Markovitz, 461 Mich 265, 270-271; 602 NW2d 367 (1999). Punitive damages are authorized, for example, by MCL 750.147.

 MCL 37.2801(3).

 There is also an overarching constitutional issue to consider. In State Farm Mut Automobile Ins Co v Campbell, 538 US 408, 416; 123 S Ct 1513; 155 L Ed 2d 585 (2003), the United States Supreme Court concluded that "[t]he Due Process Clause of the [United States Constitution’s] Fourteenth Amendment prohibits imposition of grossly excessive or arbitrary punishments on a tortfeasor.” While State Farm dealt with punitive damage awards, the due process concerns articulated in State Farm are arguably at play regardless of the label given to damage awards. A grossly excessive award for pain and suffering may violate the Due Process Clause even if it is not labeled “punitive.” In this case, however, there is no need to reach this constitutional question, given the necessity of reversal on other grounds.

 Palenkas, supra at 532.

 The excessiveness of the verdict alone provided a sufficient basis for the trial court to grant a new trial under MCR 2.611(A)(1)(d). But the true abuse of discretion below was not just the trial court’s failure to recognize that this verdict was excessive as measured by comparable cases, but its failure to recognize that plaintiffs counsel had engaged in a deliberate attempt to inflame the jury—that the verdict below was the product of an intentional course of improper conduct. Therefore, this opinion focuses on defendant’s motion for a new trial under subsection c.

 Palenkas, supra at 532.

 Id. at 532.

 See 42 USC 1981a(b)(3)(D).

 See, e.g., Braun, Mitsubishi to Pay $34 Million in Sex Harassment Case, Los Angeles Times (June 12, 1998), p A1 (noting that the settlement was distributed among “hundreds of female employees”).

 261 F3d 1295 (CA 11, 2001).

 236 Mich App 696, 700; 601 NW2d 426 (1999).

 See Weeks v Baker & McKenzie, 63 Cal App 4th 1128; 74 Cal Rptr 2d 510 (1998) (the plaintiff, who alleged that she sustained psychological injury from sexual harassment, recovered $50,000 in compensatory damages and approximately $7 million in punitive damages; the latter amount was later reduced to $3.5 million); Deters v Equifax, 981 F Supp 1381 (D Kan, 1997) (the plaintiff, whose coworkers rubbed and kissed her against her will, received $5,000 in compensatory damages and $1 million from the jury, reduced to $300,000 cap under 42 USC 1981a[b]), aff d 202 F3d 1262 (CA 10, 2000).

 See, e.g., Channon v United Parcel Service, Inc, 629 NW2d 835, 851 (Iowa, 2001) (the plaintiff, who was subjected to unwelcome touching, sexual comments, and assault, was awarded a verdict including approximately $530,000 in compensatory damages and $80,220,000 in punitive damages—the latter of which was reduced to $300,000 under title VII).

 See Firchau v Foster, 371 Mich 75, 78, 79; 123 NW2d 151 (1963) (“[W]here language is such as evinces a studied purpose to enflame or prejudice the jury, based upon facts not in the case, this Court has not hesitated to reverse.”).

 See, e.g., People v Bahoda, 448 Mich 261; 531 NW2d 659 (1994) (rejecting the defendant’s claim of prosecutorial misconduct where references to the defendant’s ethnicity were “innocuous, unintended, and not of a degree that prejudiced the defendant’s right to a fair trial”).

 In Powell v St John Hosp, 241 Mich App 64; 614 NW2d 666 (2000), the Court of Appeals “admonish[ed]” counsel for misconduct that included his efforts to “gratuitously insertD” the issue of race into a medical malpractice claim, [his] repeated “belittle[ing]” of witnesses, his inappropriate assertion that the decedent had been “tortured,” and his personal attacks against defense counsel.
Earlier, in Badalamenti v Beaumont Hosp-Troy, 237 Mich App 278, 281; 602 NW2d 854 (1999), the Court of Appeals held that counsel’s misconduct was so pervasive that it would have provided a separate basis for a new trial. Again, in Badalamenti, that Court rebuked counsel for his personal attacks against the defendant and defense counsel, his repeated argument that the defendant was greedy and only cared about money, and his appeal to the jurors’ self-interest as taxpayers. The panel concluded:
[Plaintiffs counsel] sought to divert the jurors’ attention from the merits of the case and to enflame the passion of the jury. That *777 strategy paid off handsomely here in the form of a large verdict for plaintiff. The cumulative effect of the improper innuendo, remarks, and arguments by plaintiffs lead trial counsel was so harmful and so highly prejudicial that we are unable to conclude that the verdict in this case was not affected. [Id. at 292.]

 416 Mich 97; 330 NW2d 638 (1982).

 Id. at 110.

 Id.

 Id. at 111.

 Id. at 107, 112.

 See, e.g., p 774 (“[Apparently ... when you enter the confines of a multi, a very, very successful business over on Jefferson,... the laws of civility don’t apply.”).

 See pp 775-776.

 Reetz at 111-112, quoting Steudle v Yellow & Checker Cab & Transfer Co, 287 Mich 1, 11-12; 282 NW2d 879 (1938).

 MRE 702 was amended effective January 1,2004, to particularize the kind of gatekeeper inquiry the trial court is required to make. MRE 702 now states:
If the court determines that scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of rehable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

 See n 18 and accompanying text.

 See MEE 702 (providing that expert testimony is admissible “[i]f the court determines” that certain preconditions are met). See also Daubert v Merrell Dow Pharmaceuticals, Inc, 509 US 579, 589; 113 S Ct 2786; 125 L Ed 2d 469 (1993) (concluding from similar language in Federal Rule of Evidence 702 that “the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable” [emphasis added]).
In fact, the trial court’s obligation under MRE 702 is even stronger than that contemplated by FRE 702 because Michigan’s rule specifically provides that the court’s determination is a precondition to admissibility. Compare FRE 702 (“If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue ....”) with the older MRE 702 (“If the court determines that recognized scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue ....” [Emphasis added.]).

 Kumho Tire Co Ltd v Carmichael, 526 US 137, 158-159; 119 S Ct 1167; 143 L Ed 2d 238 (1999) (Scalia, J., concurring).

 MRE 104(a) (emphasis added).

 Daubert, supra at 590.

 People v Crawford, 458 Mich 376, 388 n 6; 582 NW2d 785 (1998) (describing this rule as “basic hornbook law”).

 See People v Davis, 343 Mich 348; 72 NW2d 269 (1995); Frye v United States, 54 App DC 46; 293 F 1013 (1923).

 See, e.g., People v Young, 418 Mich 1, 24; 340 NW2d 805 (1983). Because the court’s gatekeeper role is mandated by MRE 702, rather than Davis-Frye, the question whether Davis-Frye is applicable to evidence that is not “novel” has no bearing on whether the court’s gatekeeper responsibilities extend to such evidence. These responsibilities are mandated by MRE 702 irrespective of whether proffered evidence is “novel.” See MRE 702; see also General Electric Co v Joiner, 522 US 136, 142; 118 S Ct 512; 139 L Ed 2d 508 (1997) (noting that FRE 702 overruled Frye but left intact the court’s gatekeeper responsibilities).

 See Joiner, supra at 142 (“[W]hile the Federal Rules of Evidence allow district courts to admit a somewhat broader range of scientific testimony than would have been admissible under Frye, they leave in place the 'gatekeeper ’ role of the trial judge in screening such evidence.” [Emphasis added.]).

 See, e.g., Porter v Whitehall Labs, Inc, 9 F3d 607, 615-617 (CA 7, 1993) (holding that the district court properly excluded expert testimony in which the expert’s theory that the plaintiffs injuries were caused by ingestion of ibuprofen faded under Daubert).

 See, e.g., Diaz v Johnson Matthey, Inc, 893 F Supp 358, 377 (D NJ, 1995) (concluding that an expert’s “testimony on specific causation [was] not sufficiently reliable to be admissible under Rule 702”).

 Joiner, supra at 146.

 Id.

 Mr. Hnat told the jury that “[pjancreatitis is the worse [sic] pain a person could experience. The pancreas as you know is very innervated [sic] and when you develop pancreatitis that is the most painful way to die.”

 A social worker is certified in Michigan under MCL 333.18511. “Social work,” as used in this section, is defined as
the professional application of social work values, principles, and techniques to counseling or to helping an individual, family, group, or community do 1 or more of the following:
(i) Enhance or restore the capacity for social functioning [or]
(ii) Provide, obtain, or improve tangible social and health services. [MCL 333.18501(l)(d)].

 Mr. Hnat was allowed to testify based in part on his assertions—both in court and in a written resume submitted as an exhibit—that he had a master’s degree in psychobiology from the University of Michigan and that he had received the prestigious Pillsbury Prize in psychology as an undergraduate. Defendant discovered after trial that both statements were false. Contrary to his sworn testimony, plaintiff had neither obtained a master’s degree in psychobiology nor received the Pillsbury Prize as an undergraduate.
We disagree with the Court of Appeals’ suggestion that the trial court could have legitimately concluded that Mr. Hnat “had simply misspoken” when he said that he had a Master’s degree in psychobiology and had won the Pillsbury Prize. Slip op p 30. We doubt that anyone could honestly misspeak about having a degree that he did not, in fact, possess, much less that he could “misspeak” in a written resume. We also disagree with the lower courts’ conclusion that there is no real difference between *785 completing coursework necessary for a degree and actually receiving a degree. Unless and until an educational institution confers a degree, which is the institution’s official determination that a student has met all the requirements, an expert witness may not, consistent with the oath, affirmatively represent to having “received” the degree.
This discrepancy in Mr. Hnat’s qualifications could not have been inadvertent and ought to have given the trial court additional pause while evaluating defendant’s jnov motion. In addition, the falsification of Mr. Hnat’s credentials supports our concern that the trial of this case was rife with unseemly tactics by plaintiffs counsel.

 After plaintiff left the courtroom (apparently at counsel’s request), counsel told the jury, “While it is necessary for me to review evidence, I don’t believe that it is necessary for me to review statements made by doctors in front of Linda Gilbert with regard to the prognosis that she has for her life, because I don’t believe that it is my job here to rob her of whatever hope that she may have for the future.”

 Slip op at 33-34, quoting Grow, 236 Mich App 713-714.

 In Grow, for example, the Court of Appeals held that the testimony of a certified social worker with fourteen years of experience in counseling "victims of sexual, physical, and emotional abuse” was admissible on the issue of plaintiffs posttraumatic stress disorder. Id. at 713. Because the social worker in Grow had actual experience in counseling persons suffering from posttraumatic stress disorder, his testimony was admissible under MRE 702, which refers to a witness “qualified as an expert by knowledge, skill, experience, training, or education....” (Emphasis added.) If the defendant in Grow had offered the expert opinion of a psychiatrist with experience in treating posttraumatic stress disorder, the more limited qualifications of the plaintiffs certified social worker would have been relevant to the weight of his testimony even though they would not have barred its admission.

 Crawford, supra at 388 n 6.

 See slip op at 34.

 Zuzula v Abb Power T &D Co, Inc, 267 F Supp 2d 703, 711 (ED Mich, 2003) (emphasis added).

 We do not mean to say, however, that every incident described at trial was admissible to support a claim of sexual harassment. In Haynie v Michigan, 468 Mich 302; 664 NW2d 129 (2003), we stressed that sexual harassment is defined by statute as “ ‘unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct or communication of a sexual nature Id. at 309, quoting MCL 37.2103(i) (emphasis added). Some of the incidents described during this trial were not sexual in nature and therefore were improperly admitted to support plaintiffs theory of sexual harassment. Haynie shall control the admission of evidence at the retrial.

 Chambers v Trettco, Inc, 463 Mich 297, 312; 614 NW2d 910 (2000).

 Id. at 319.

 See id.

 Id. at 311 (emphasis added).