*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

ESTATE OF DIANE M. SMITH, by WALTER R. SMITH, Personal Representative,

Plaintiff-Appellee,

v

KARSTEN H. FLIEGNER, M.D., GENESYS HEALTH SYSTEM, GENESYS REGIONAL MEDICAL CENTER, doing business as GENESYS HEART INSTITUTE, GENESYS PRACTICE PARTNERS, INC., doing business as GENESYS HEART INSTITUTE PHYSICIAN GROUP, and GENESYS AMBULATORY HEALTH SERVICES, INC., doing business as GENESYS HEART INSTITUTE PHYSICIAN GROUP,

Defendants-Appellants.

UNPUBLISHED
February 18, 2020

No. 343667
Genesee Circuit Court
LC No. 17-108694-NH

Before: MURRAY, C.J., and SWARTZLE and CAMERON, JJ.

PER CURIAM.

In this medical-malpractice action arising out of the death of Diane M. Smith, defendants appeal by leave granted[1] the trial court's order denying their motion for summary disposition under MCR 2.116(C)(10) (no genuine issue of material fact) and their alternative request for a *Daubert* hearing. We vacate the order appealed and remand for further proceedings consistent with this opinion.

---

[1] *Estate of Diane M Smith v Fliegner*, unpublished order of the Court of Appeals, entered November 13, 2018 (Docket No. 343667).

# I. BACKGROUND

This medical-malpractice action arises out of the 71-year-old decedent's death several weeks after she underwent heart surgery. On May 4, 2015, defendant Dr. Karsten Fliegner performed the surgery, which involved "an aortic valve replacement and two vessel coronary artery bypass grafting." It is undisputed that four drainage tubes (or "drains") were placed at the end of the surgery. Two were larger chest tubes, and the other two were "smaller diameter," "bilateral Blake drains." The two larger drains were removed from the decedent before she was discharged from the hospital on May 11, 2015. The Blake drains, however, were left in place at the time she was discharged. Physician's Assistant Christopher Noth indicated that he decided to discharge the decedent with the Blake drains still in place, without consulting Dr. Fliegner, because of the amount of fluid that had been draining from them. At his deposition, plaintiff Walter R. Smith, who is the decedent's widower, indicated that he saw the Blake drains for the first time shortly before the decedent was discharged.

According to Noth, on May 22, 2015, the Blake drains were removed by a medical assistant. Five days later, the decedent was brought to the emergency room of defendant Genesys Regional Medical Center, complaining of "worsening shortness of breath, . . . lower extremity edema and chest heaviness," among other things. The decedent's blood pressure was low, and after she went into respiratory failure, she was intubated and placed on a ventilator. She was diagnosed with acute cardiogenic shock, severe aortic insufficiency, and pulmonary edema. In critical condition, she was transferred to Henry Ford Hospital by helicopter, while her condition continued to deteriorate. A cardiac surgeon determined that the decedent was not a candidate for further surgical intervention. After consulting with the medical staff about the decedent's poor prognosis, her family expressed their desire that she not be resuscitated if she went into cardiac arrest. She subsequently did so and died.

The day after the decedent's death, Dr. Kanu Virani, the deputy-chief-medical examiner for the Oakland County Medical Examiner's Office, performed an autopsy. Dr. Virani discovered a "large amount of pus around the midline chest surgical wound above and behind the sternum infiltrating the soft tissue." Also, "[s]ections taken from the chest wall tissue near the surgical wound show[ed] acute inflammation and necrosis in skeletal muscles and adipose tissue." Based on his observations, Dr. Virani concluded that the decedent had "died of post surgical wound infection," with "[h]ypertensive and arteriosclerotic heart disease, and obesity . . . contributory."

Acting as personal representative of the decedent's estate, plaintiff filed suit against defendants, alleging that they, or their agents or employees, had breached the applicable standard of care by failing to remove the drains from the decedent's chest within a few days after her surgery. Plaintiff alleged that it had been "especially important to remove the drains from [the decedent] because she had a high risk of infection because of her prior history of diabetes, obesity and radiation to her chest as a result of . . . breast cancer." Plaintiff also claimed that defendants' alleged breach of the standard of care "substantially increased the risk of the development of an insidious post-operative infection," that it did, in fact, cause the decedent to develop "septic shock resulting from mediastinitis" (i.e., an infection of the mediastinum), and that the decedent died as a result. The allegations in plaintiff's complaint were supported by an affidavit of merit (AOM) executed by Dr. Louis E. Samuels, who indicated that he is "a board certified surgeon and thoracic

surgeon, with a specialty in cardiothoracic surgery, licensed to practice in the State of Pennsylvania."

Following discovery, defendants moved for summary disposition under MCR 2.116(C)(10) or, in the alternative, a *Daubert* hearing. Defendants argued that plaintiff's expert witness regarding causation, Dr. Herbert Tanowitz, had admitted that the decedent's mediastinitis either *was* seeded during the initial surgery or was more *likely* seeded at that time than at any later time. Therefore, defendants argued, plaintiffs could not carry their burden of demonstrating that defendants' alleged breach of the standard of care—which allegedly occurred days after the surgery—had proximately caused the decedent's mediastinitis and her ensuing death. In support, defendants cited Dr. Tanowitz's deposition testimony that (1) "[s]ternal wound infections are usually implanted at the time of the surgery," (2) "intraoperative wound contamination probably occurs in virtually all patients" who undergo "a sternotomy" (i.e., a medical procedure in which the patient's sternum is opened to provide access to the heart or lungs), (3) infections like the decedent's mediastinitis are "usually seeded at the time of surgery," (4) the pleurae are not located within the mediastinum, (5) "there was no evidence of any infection or inflammation of the pleura here," nor of any fistula (i.e., abnormal connection) between the pleurae and the mediastinum, and (6) Dr. Tanowitz did not "know the exact anatomy" of how "chest tubes" are generally placed, or of how they were placed in this case, because he does not personally perform such procedures.

In response, plaintiff argued that there was a genuine issue of material fact for resolution at trial about whether defendants' failure to remove the Blake drains from the decedent within 48 hours of surgery constituted a breach of the applicable standard of care that proximately caused her death. As evidentiary support, plaintiff cited (1) Dr. Samuels's AOM, in which he averred that the standard of care is to remove such drains from a patient a few days after surgery, and that "[i]t was the presence of the drains, for weeks longer than recommended, that caused the infection which led to septic shock and [the decedent's] death," (2) a peer-reviewed article from 2017 that states, "In the existing literature, it is suggested that drainage tube removal be performed as soon as possible, and always within 1 to 2 days after surgery," (3) a peer-reviewed article from 1989 indicating "that drains generally can be removed safely on the first postoperative day" and that removing them later "unnecessarily increases the risk of infection, mechanical irritation by the tubes and discomfort to the patient," (4) a peer-reviewed article from 2013 that states, "Retention of drains longer than 48 hours in the operative site" is an "important modifiable risk factor[] for the development of organ/space sternal wound infections after cardiac surgery," (5) a peer-reviewed article from 2002 suggesting that physicians "[t]hink again about the value of prophylactic drains" and, if they elect "to continue using them, remove them after 24-48 hours," (6) an excerpt from chapter 11 of the *Sabiston Textbook of Surgery* (20th ed), which states, "Drains placed in incisions probably cause more infections than they prevent. . . . Considering . . . this risk, they should be used as little as possible and removed as soon as possible," and (7) an affidavit in which Dr. Samuels indicated that his trial testimony concerning causation would be supported by the 2017 peer-reviewed article and the foregoing excerpt from *Sabiston*. Before oral argument, plaintiff also produced an affidavit, executed by Dr. Tanowitz in March 2018, that supported plaintiff's causation theory more directly than had Dr. Tanowitz's deposition testimony.

After entertaining oral argument, the trial court denied defendants' motion for summary disposition and partially denied their request for a *Daubert* hearing, holding that the court would

-3-

entertain such a hearing—at trial—as to Dr. Samuels, but not as to Dr. Tanowitz. Defendants filed a motion for reconsideration, which the trial court denied. This appeal followed.

## II. ANALYSIS

On appeal, defendants primarily argue that the trial court erred by denying their motion for summary disposition under MCR 2.116(C)(10). In part, their argument rests on the assertion that the trial court should not have considered the expert opinions of Dr. Samuels and Dr. Tanowitz without first entertaining the requested *Daubert* hearings concerning those experts. We conclude that, under the circumstances in this case, a *Daubert* hearing in the trial court is necessary before a proper determination concerning summary disposition is possible.[2]

We review de novo a trial court's decision to grant or deny a motion for summary disposition to determine whether the moving party was entitled to judgment as a matter of law. *Maiden v Rozwood*, 461 Mich 109, 118; 597 NW2d 817 (1999). "A motion under MCR 2.116(C)(10) tests the factual sufficiency of the complaint." *Id*. at 120. When evaluating such a motion, a trial court considers the evidence submitted by the parties in the light most favorable to the party opposing the motion. *Id*. Where the proffered evidence fails to establish a genuine issue regarding any material fact, the moving party is entitled to judgment as a matter of law. *Id*.

Regarding a motion under MCR 2.116, the moving party bears the initial burden of production, which may be satisfied in one of two ways. *Quinto v Cross & Peters Co*, 451 Mich 358, 361; 547 NW2d 314 (1996). "First, the moving party may submit affirmative evidence that negates an essential element of the nonmoving party's claim. Second, the moving party may demonstrate to the court that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim." *Id*. at 362 (cleaned up). Once the moving party satisfies its burden in one of those two ways, "[t]he burden then shifts to the opposing party to establish that a genuine issue of disputed fact exists." *Id*.

"In a medical malpractice case, the plaintiff bears the burden of proving (1) the applicable standard of care, (2) a breach of that standard by the defendant, (3) an injury, and (4) proximate causation between the alleged breach of duty and the injury." *Rock v Crocker*, 499 Mich 247, 255; 884 NW2d 227 (2016). At issue here are the first two elements, along with the fourth, and as a general rule, "[e]xpert testimony is required in medical malpractice cases to establish the applicable standard of care and to demonstrate that the defendant somehow breached that standard." *Birmingham v Vance*, 204 Mich App 418, 421; 516 NW2d 95 (1994).

---

[2] Although this Court previously granted plaintiff's motion to expand the record to include two affidavits executed by Dr. Virani, *Estate of Diane M Smith v Fliegner*, unpublished order of the Court of Appeals, entered April 8, 2019 (Docket No. 343667), those affidavits are not properly considered in our review here because they were not presented to the trial court before it ruled concerning summary disposition. See *Barnard Mfg Co, Inc v Gates Performance Engineering, Inc*, 285 Mich App 362, 380; 775 NW2d 618 (2009). Accord *Innovative Adult Foster Care, Inc v Ragin*, 285 Mich App 466, 474 n 6; 776 NW2d 398 (2009); *Peña v Ingham Co Rd Comm*, 255 Mich App 299, 313 n 4; 660 NW2d 351 (2003).

We conclude that the trial court erred by failing to consider and decide whether the challenged expert testimony was substantively admissible *before* considering it for purposes of summary disposition under MCR 2.116(C)(10). Under MCR 2.116(G)(6), "[a]ffidavits, depositions . . . and documentary evidence offered in support of or in opposition to a motion based on subrule (C)(1)-(7) or (10) shall only be considered to the extent that the content or substance would be admissible as evidence to establish or deny the grounds stated in the motion." The reviewing court "should evaluate a motion for summary disposition under MCR 2.116(C)(10) by considering the *substantively admissible* evidence actually proffered." *Maiden*, 461 Mich at 121 (emphasis added).

MCL 600.2955 provides:

(1) In an action for the death of a person or for injury to a person or property, a scientific opinion rendered by an otherwise qualified expert is not admissible unless the court determines that the opinion is reliable and will assist the trier of fact. In making that determination, the court shall examine the opinion and the basis for the opinion, which basis includes the facts, technique, methodology, and reasoning relied on by the expert, and shall consider all of the following factors:

(a) Whether the opinion and its basis have been subjected to scientific testing and replication.

(b) Whether the opinion and its basis have been subjected to peer review publication.

(c) The existence and maintenance of generally accepted standards governing the application and interpretation of a methodology or technique and whether the opinion and its basis are consistent with those standards.

(d) The known or potential error rate of the opinion and its basis.

(e) The degree to which the opinion and its basis are generally accepted within the relevant expert community. As used in this subdivision, "relevant expert community" means individuals who are knowledgeable in the field of study and are gainfully employed applying that knowledge on the free market.

(f) Whether the basis for the opinion is reliable and whether experts in that field would rely on the same basis to reach the type of opinion being proffered.

(g) Whether the opinion or methodology is relied upon by experts outside of the context of litigation.

(2) A novel methodology or form of scientific evidence may be admitted into evidence only if its proponent establishes that it has achieved general scientific acceptance among impartial and disinterested experts in the field.

Additionally, MRE 702 provides:

If the court determines that scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise if

(1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

As a general rule, "there is no requirement that an expert's qualifications and methods be incorporated into an affidavit submitted in support of, or opposition to, a motion for summary disposition. Rather, the *content* of the affidavits must be admissible in *substance*, not form." *Dextrom v Wexford Co*, 287 Mich App 406, 428; 789 NW2d 211 (2010). Trial courts, however, have a "gatekeeping obligation" under MRE 702, which obliges them "to review *all* expert opinion testimony" for admissibility under that rule. *Craig v Oakwood Hosp*, 471 Mich 67, 82; 684 NW2d 296 (2004). "This gatekeeper role applies to *all stages* of expert analysis. MRE 702 mandates a searching inquiry, not just of the data underlying expert testimony, but also of the manner in which the expert interprets and extrapolates from those data." *Gilbert v DaimlerChrysler Corp*, 470 Mich 749, 782; 685 NW2d 391 (2004). Furthermore, "[c]areful vetting of all aspects of expert testimony is especially important when an expert provides testimony about causation." *Id*. "While a party may waive any claim of error by failing to call this gatekeeping obligation to the court's attention, the court *must* evaluate expert testimony under MRE 702 once that issue is raised." *Craig*, 471 Mich at 82. Moreover, a party need not wait until trial to raise such a challenge; rather, the issue is properly raised at summary disposition. See, e.g., *Elher v Misra*, 499 Mich 11, 14; 878 NW2d 790 (2016). A party relying on expert-opinion testimony to survive summary disposition bears the burden of demonstrating that such testimony will be admissible at trial, under MRE 702, before it can be properly considered for purposes of summary disposition. *Amorello v Monsanto Corp*, 186 Mich App 324, 331-332; 463 NW2d 487 (1990).

In this case, defendants raised a challenge under MRE 702 to the causation and standard-of-care opinions offered by two of plaintiffs' medical experts: Dr. Samuels and Dr. Tanowitz. After correctly recognizing that, in the face of such a challenge, the trial court was "compelled to have a *Daubert* hearing," the trial court nevertheless held that it would only entertain one with regard to Dr. Samuels—refusing to permit a *Daubert* hearing as to Dr. Tanowitz. Moreover, the trial court ruled on the motion for summary disposition *before* conducting the requested *Daubert* hearing, ruling that it would conduct that hearing during the trial, immediately before Dr. Samuels testified.

By so ruling, the trial court disregarded its gatekeeping obligation under MRE 702, considering the disputed expert testimony to be substantively admissible for purposes of summary disposition without first determining whether it would, in fact, be admissible at trial under MRE 702. Indeed, the trial court abdicated its gatekeeping role concerning Dr. Tanowitz *altogether*, holding that it would not consider the scientific reliability of his opinion testimony even at trial. This is particularly concerning given that, when Dr. Tanowitz was deposed, he admitted that he did not "know the exact anatomy" of how "chest tubes" are generally placed, or how the Blake drains at issue here were placed, because he does not personally perform such procedures. In any event, by basing its decision concerning summary disposition on challenged expert testimony that may prove to be substantively *in*admissible following a *Daubert* hearing, the trial court erred.

Therefore, we vacate the order appealed and remand for further proceedings consistent with this opinion. On remand, the trial court shall (1) permit plaintiff an opportunity to name a new expert or experts to take the place of Dr. Tanowitz, who died during the pendency of this

appeal; (2) afford the parties an opportunity to conduct discovery concerning any such new expert or experts; (3) hold a *Daubert* hearing with regard to all expert opinions that the parties may elect to challenge on remand under MRE 702; and (4) after ruling on the *Daubert* matter, reconsider the summary disposition issue, permitting the parties to file new briefs in light of whether the disputed expert testimony is deemed to be admissible under MRE 702.

Vacated and remanded for further proceedings consistent with this opinion. We do not retain jurisdiction.

/s/ Christopher M. Murray
/s/ Brock A. Swartzle
/s/ Thomas C. Cameron