*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

ESTATE OF JASON A. BLACKWELL, by PENNY COLE, Personal Representative,

Plaintiff-Appellant/Cross-Appellee,

v

ST. MARY'S OF MICHIGAN doing business as ST. MARY'S OF MICHIGAN HOSPITAL,

Defendant-Appellee/Cross-Appellant.

UNPUBLISHED
August 13, 2020

No. 346652
Saginaw Circuit Court
LC No. 15-028060-NH

Before: FORT HOOD, P.J., and JANSEN and TUKEL, JJ.

JANSEN, J. (*concurring in part, dissenting in part*).

I concur with the majority's ultimate conclusion that the trial court did not abuse its discretion by excluding Timothy F. Hawkins' expert opinion. I write separately because I agree with the trial court's reasoning that although Hawkins was qualified under MCL 600.2169 to provide expert testimony on the standard of care for defendant's hospital administrators in developing and implementing a Code Blue policy, Hawkins' expert opinion was nevertheless inadmissible under MRE 702. In my view, Hawkins' expert opinion was not rationally derived from a solid foundation. I also agree with the majority that Dr. Dennis Doblar and Dr. Paul Allen were unqualified to offer standard of care testimony in relation to plaintiff's hospital administration claims.

However, I disagree with the majority that plaintiff had presented sufficient evidence of causation to support her nursing malpractice claims. Because I would affirm the trial court's order granting summary disposition in favor of defendants on plaintiff's nursing malpractice claims, I respectfully dissent.

## I. HAWKINS' EXPERT TESTIMONY

Plaintiff argues that the trial court abused its discretion by concluding Hawkins' expert testimony was inadmissible. Like the majority, I disagree.

-1-

This Court reviews for an abuse of discretion a trial court's ruling regarding the qualifications of an expert witness. *Crego v Edward W Sparrow Hosp Ass'n*, 327 Mich App 525, 531; 937 NW2d 380 (2019). A court abuses its discretion when its decision falls outside the range of reasonable and principled outcomes. *Id.* We review de novo a trial court's decision on a motion for summary disposition. *El-Khalil v Oakwood Healthcare, Inc*, 504 Mich 152, 159; 934 NW2d 665 (2019). In challenging Hawkins's qualifications, defendant moved for summary disposition under MCR 2.116(C)(10). In *El-Khalil*, our Supreme Court explained:

> A motion under MCR 2.116(C)(10), . . . , tests the factual sufficiency of a claim. *Johnson v VanderKooi*, 502 Mich 751, 761; 918 NW2d 785 (2018). When considering such a motion, a trial court must consider all evidence submitted by the parties in the light most favorable to the party opposing the motion. *Id*. A motion under MCR 2.116(C)(10) may only be granted when there is no genuine issue of material fact. *Lowrey v LMPS & LMPJ, Inc*, 500 Mich 1, 5; 890 NW2d 344 (2016). "A genuine issue of material fact exists when the record leaves open an issue upon which reasonable minds might differ." *Johnson*, 502 Mich at 761 (quotation marks, citation, and brackets omitted in original).

## A. WHETHER HAWKINS IS QUALIFIED TO TESTIFY REGARDING THE STANDARD OF CARE FOR HOSPITAL ADMINISTRATORS

To succeed on a claim of malpractice, a plaintiff is required to demonstrate (1) the standard of care, (2) a breach of that standard of care, (4) injury, and (4) proximate causation between the injuries and the alleged breach of the standard of care. *Lanigan v Huron Valley Hosp, Inc*, 282 Mich App 558, 565; 766 NW2d 896 (2009). When a party offers expert testimony, it is the trial court's obligation to act as a gatekeeper to ensure that the expert's qualifications, as well as the testimony itself, meets the threshold standards under the law. *Gay v Select Specialty Hosp*, 295 Mich App 284, 813 NW2d 354 (2012).

Count I of plaintiff's first amended complaint alleged that defendant's hospital administrators failed to adopt internal policies and procedures for responding to a Code Blue within any area of the hospital. Plaintiff specifically alleged that defendant's administrators did not adopt an appropriate plan and procedure to ensure that the ICU was properly staffed to respond to a Code Blue in a timely manner. According to plaintiff, administrators should have ensured that the ICU was staffed with an in-house physician, or that a physician was immediately available for consult, particularly with respect to issues involving a patient's airway or respiratory issues. Plaintiff alleged that as a result of these breaches of the standard of care, Jason Blackwell did not receive appropriate care and treatment because (1) he was not treated by an anesthesiologist, trauma surgeon, emergency room physician, or other qualified physician, and (2) he did not receive adequate airway management at the necessary time, which ultimately led to his death. Plaintiff offered Hawkins' testimony to bolster her claims. At issue here is whether Hawkins was qualified to testify concerning the standard of care for a hospital administrator.

MCL 600.2169 provides, in pertinent part:

> (1) In an action alleging medical malpractice, a person shall not give expert testimony on the appropriate standard of practice or care unless the person is

licensed as a health professional in this state or another state and meets the following criteria:

(a) If the party against whom or on whose behalf the testimony is offered is a specialist, specializes at the time of the occurrence that is the basis for the action in the same specialty as the party against whom or on whose behalf the testimony is offered. However, if the party against whom or on whose behalf the testimony is offered is a specialist who is board certified, the expert witness must be a specialist who is board certified in that specialty.

(b) Subject to subdivision (c), during the year immediately preceding the date of the occurrence that is the basis for the claim or action, devoted a majority of his or her professional time to either or both of the following:

(*i*) The active clinical practice of the same health profession in which the party against whom or on whose behalf the testimony is offered is licensed and, if that party is a specialist, the active clinical practice of that specialty.

(*ii*) The instruction of students in an accredited health professional school or accredited residency or clinical research program in the same health profession in which the party against whom or on whose behalf the testimony is offered is licensed and, if that party is a specialist, an accredited health professional school or accredited residency or clinical research program in the same specialty.

(c) If the party against whom or on whose behalf the testimony is offered is a general practitioner, the expert witness, during the year immediately preceding the date of the occurrence that is the basis for the claim or action, devoted a majority of his or her professional time to either or both of the following:

(*i*) Active clinical practice as a general practitioner.

(*ii*) Instruction of students in an accredited health professional school or accredited residency or clinical research program in the same health profession in which the party against whom or on whose behalf the testimony is offered is licensed.

(2) In determining the qualifications of an expert witness in an action alleging medical malpractice, the court shall, at a minimum, evaluate all of the following:

(a) The educational and professional training of the expert witness.

(b) The area of specialization of the expert witness.

(c) The length of time the expert witness has been engaged in the active clinical practice or instruction of the health profession or the specialty.

(d) The relevancy of the expert witness's testimony.

The record before us indicates that Hawkins is board-certified in hospital administration and holds the designation of a Fellow of the American College of Healthcare Executives. Hawkins also has a bachelor's degree and a master's degree in business administration from the University of Akron. At the time he was deposed in this case, Hawkins worked part time in hospital administration expert witness consulting, and from 2009 until 2012, he served as the executive vice president and chief operating officer of the Villages Regional Hospital, which is part of the Central Florida Health Alliance. Previously, Hawkins served as the senior vice president of clinical services for Central Florida Health Alliance from 2008 to 2009, he was the senior vice president and chief administrative officer of Thompson Cancer Survival Centers from 2007 to 2008, and he was the vice president of clinical services for Baptist Hospital of Miami from 1999 to 2007. Hawkins also worked at Mercy Hospital as the vice president of support services, the administrative director of support services, and the director of materials management. Additionally, Hawkins worked as the assistant director of materials management, and as director and assistant director of purchasing for Akron City Hospital. Hawkins also sat on the Board of Directors for the University of Miami Masters in Healthcare Administration Advisory Board during an unspecified period.

In my view, the trial court did not abuse its discretion in concluding that Hawkins's qualifications satisfy the requirements of MCL 600.2169 because he is board-certified in hospital administration, having worked in that capacity for more than 10 years before testifying in this case, he was a hospital safety manager, and in the year preceding the alleged malpractice he devoted a majority of his professional time to the active clinical practice of hospital administration. MCL 600.2169(1)(b)(*i*). The trial court also considered Hawkins's "educational and professional training," that hospital administration was his area of specialization, and the length of time that Hawkins had devoted his professional career to hospital administration, as required by MCL 600.2169(2)(a), (b), and (c). The trial court's decision that Hawkins was qualified under MCL 600.2169 to testify regarding the standard of care for hospital administration is within the range of reasonable and principled outcomes.

## B. WHETHER HAWKINS'S OPINION IS THE PRODUCT OF RELIABLE PRINCIPLES AND METHODS

Although I believe Hawkins was qualified under MCL 600.2169, I do not believe his opinion was the product of reliable principles and methods, and that his testimony was properly excluded on that basis.

In his deposition, Hawkins described that the Joint Commission[1] and other regulatory bodies require that hospitals put in place policies to deal with "cardiac and respiratory and other critical issues." He added:

> Then the hospitals, themselves, will administratively put together a code blue policy
> and procedure in conjunction with the clinical staff, the nursing staff, and the

---

[1] The Joint Commission was founded in 1951 and accredits and certifies more than 22,000 hospitals around the United States. The Joint Commission also develops standards that focus on patient safety and quality of care.

medical staff of the hospital on how we're going to deal with cardiac arrests, respiratory arrests, other critical natures of that – or things of that nature. And it may not be called code blue. It could be code red. It could be code rescue. It could have any number of names.

Such a policy is developed not only for regulatory purposes, but also to address the patient-care needs of the hospital. Hawkins also explained that a small community hospital may have a different policy and procedure for a Code Blue than a major teaching hospital, such as defendant's hospital. This is because larger hospitals that are trauma centers may perform surgeries and provide services that a smaller hospital does not. Because the needs of a hospital may vary, the Joint Commission "is not prescriptive in its policy and procedure standards" and will allow each hospital to develop its own policies and procedures.

Hawkins opined that Dr. Vinay Shah, M.D., a second-year resident who responded to the Code Blue, did not have the proper training to attend to Blackwell when he coded on the morning of March 17, 2012, because Dr. Shah had never revised a tracheotomy tube. While Hawkins described defendant's Code Blue policy as "comprehensive," the one thing he believed was missing was "adequate implementation." Hawkins expressed his concern that Dr. Shah had testified that he was not aware that a Code Blue policy existed for the hospital, and particularly that he had not been trained with regard to it and was not familiar with its requirements. After acknowledging that Dr. Shah had contacted the anesthesiology department, the emergency department, and Dr. Hackett, Hawkins elaborated with respect to how implementation of the Code Blue policy was not handled effectively by defendant:

> Yes, [Dr. Shah] called the – or he instructed the unit clerk or somebody, the clerical individual that was attending the code, to call those individuals. He neglected to call the . . . intensivist that was on call for the surgical ICU. When he realized that he needed additional help, he called those other specialties.

> Part of the policy and procedure, in order for it to be effective, is the administration of the hospital, which my counterparts at St. Mary's are responsible for providing the proper trained individuals to provide service under that policy. . . .

> Since this was a surgical ICU, the hospital administration has a responsibility for some arrangement with someone that can deal with surgical ICU cases. In my past experience, we used the emergency room physicians. As part of their emergency room contract, they would attend all code blues, or intensivists.

> We had a contract for 24-7 to have intensive care physicians in our facilities. The intensivists would then deal with a patient like Patient Blackwell. So they would arrive on scene at the same time as Dr. Shah. Dr. Shah, being a student, a resident physician, would be there to perform the procedures under the guidance of a fellowship-trained ER physician or a fellowship-trained intensivist or a surgeon.

\* \* \*

The – on a nursing unit outside of the intensive care setting, you would expect to find respiratory arrests and cardiac arrests. In those areas, the internal medicine resident and physicians are trained to deal with those using [Advanced Cardiovascular Life Support (ACLS)][2] protocols, which are nationally-publicized published protocols. And they'll follow those protocols and treat the patient.

In the surgical ICU, there are no nationally publicized protocols for a surgical code. It depends upon what that particular patient needs, which is why there's a higher standard in the intensive care unit, which is why you have the intensive care unit to begin with.

And these codes should be attended by somebody that's fellowship trained in either emergency medicine or as a surgical intensivist.

Hawkins also observed that defendant's hospital essentially provided two standards of care, one during the dayshift hours during the week when an intensivist would be on staff and ready to assist with a Code Blue, and another after the dayshift was over, when the Code Blue was turned over to a second-year medical resident and there was no fellowship-trained physician on site to treat the patients in the surgical ICU. When asked how defendant could have complied with the standard of care, Hawkins explained:

The stand—the national standards of care with the Joint Commission require the hospital, if they're going to provide a service, then they have to have qualified staff to – to take care of those patients that – that are in the hospital. So if you're going to perform surgery and have a surgical ICU, you have to have qualified individuals, not just on the dayshift, Monday through Friday, but 24-7. the Joint Commission will not allow us to provide physical therapy services just Monday through Friday. It's you know, as simple as that.

When you get to critical care services, they expect them 24-7. So the patient that codes at noon receives the same level of care that -- of the patient that codes at midnight. Those are standards that the Joint Commission sets, that you cannot have two standards of care unless that standard of care – unless the treatment of that patient would not result in a negative outcome.

Well, when you're dealing with code blues, if you've got the expert fellowship physicians that are treating the patient during the daytime and a second-year resident treating them at night, and it's only a matter of time before one of those patients that are coding at night has an out—a bad outcome because the expert wasn't there with them.

---

[2] Hawkins described that ACLS protocols are published by the American Heart Association for patients who have cardiac or respiratory arrest and there are "specific steps that are medications and steps that take place during the code that are followed nationwide."

Hawkins clarified that to satisfy the standard of care, defendant must not only develop an appropriate Code Blue policy, but implement it as well.

Hawkins stated that he stepped down from his position as Chief Executive Officer (CEO) of the Villages Hospital in 2012 after a new CEO was selected and chose to bring his own administrative team. Hawkins had not held an executive position in a hospital since that time, and he had never worked in a hospital in Michigan. Hawkins also conceded that he did not contact any local hospital administrators in the Saginaw area, or any other health system in Michigan, when preparing his opinion in this case. Hawkins also agreed that he had not had primary responsibility for drafting a policy or procedure for ICU management. Hawkins agreed that while the Joint Commission standards do not list specific individual disciplines that are required to be on a Code Blue team, the standards "specifically state that the members of the code team who are providing the clinical services have the training to perform whatever it is you're requesting them to perform." However, the Joint Commission does not list a specific set of skills that must be held by a member of a Code Blue team. Those standards also do not require that an intensivist, critical care medicine specialist, or an anesthesiologist be in-house in a hospital around-the-clock. Additionally, the hospital at which Hawkins served as CEO, the Villages Hospital, was not a teaching hospital or trauma center, and it did not have a residency program.

In his first deposition in June 2017, Hawkins stated that he was relying on the Joint Commission standards in formulating his opinion, the first being LD-03.606.01, which requires that hospitals provide "for a sufficient number and mix of individuals to support safe, quality care, treatment and services." The standard further required that "[t]he number and mix of individuals [be] appropriate to the scope and complexity of the services offered," but it did not list specific disciplines that are required. The next standard that Hawkins relied on, LD-04.0307, provides that patients with comparable needs receive the same standard of care and treatment throughout the hospital. Hawkins offered this opinion regarding how defendant breached this standard of care:

> The primary opinions that I have regarding the code coverage is that the two standard of care standards from the Joint Commission [were] violated because during the day the codes – the patients are attended to and codes attended to by the intensive care physician who's a fellowship trained physician capable of dealing with endotracheal tubes and tracheotomies and the care and maintenance of those. After hours, according to deposition testimony, a second-year resident who admitted that he had no experience with tracheotomy tubes, and Mr. Blackwell was the first tracheotomy tube that he had dealt with, is the physician that attended to him during the code.
>
> So there's two standards of care taking place. We've got a fellowship trained physician if you have an arrest or a medical emergency during the day, and you have a second-year resident treating you medically after hours.

Hawkins also stated that he would "expand" his criticism to defendant's hospital administration because it did not compel an emergency room physician to attend the Code Blue, unless that physician was already involved with a Code Blue in the emergency room. According to Hawkins, defendant's staff ought to have contacted an intensivist to come to Blackwell's bedside to rectify the problem with his airway and the proper chain in command to allow that to happen was not in

place. Hawkins also elaborated that an emergency room physician ought to have been summoned to the ICU to deal with Blackwell, who at that point was *in extremis*. While acknowledging that the Joint Commission standards do not require that a hospital have an intensivist in-house around-the-clock, Hawkins emphasized that whatever services are provided during the day shift must also be provided to patients during the night shift.

MRE 702 provides:

> If the court determines that scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise if (1) the testimony is based on sufficient facts or data, (2) *the testimony is the product of reliable principles and methods*, and (3) *the witness has applied the principles and methods reliably to the facts of the case*. [Emphasis added.]

In *Daubert v Merrell Dow Pharmaceuticals, Inc*, 509 US 579; 113 S Ct 2786; 125 L Ed 2d 469 (1993), the United States Supreme Court referred to a dictionary definition in interpreting the word "knowledge" in FRE 702,[3] the federal counterpart to MRE 702. The Court observed that "the word 'knowledge' connotes more than subjective belief or unsupported speculation. The term 'applies to any body of known facts or to any body of ideas inferred from such facts or accepted as truths on good grounds.' " *Daubert*, 509 US at 590, quoting Webster's Third New International Dictionary 1252 (1986). The Court stated: "In short, the requirement that an expert's testimony pertain to 'scientific knowledge' [as set forth in FRE 702] establishes a standard of evidentiary reliability." *Daubert*, 509 US at 590.

Similarly, in *Gilbert v DaimlerChrysler Corp*, 470 Mich 749, 782; 685 NW2d 391 (2004), our Supreme Court emphasized that the trial court's important role as a gatekeeper applies at all stages of the analysis concerning an expert witness, and that MRE 702 requires a "searching inquiry" not only of the data underlying the expert's opinion, "*but also of the manner in which the expert interprets and extrapolates from those data*." (Emphasis added.) The Court stated:

> Thus, it is insufficient for the proponent of expert opinion merely to show that the opinion rests on data viewed as legitimate in the context of a particular area of expertise (such as medicine). The proponent must also show that any opinion based on those data expresses conclusions reached through reliable principles and methodology. [*Id*.]

---

[3] In *Daubert*, 509 US at 588, the Court quoted FRE 702 as follows:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

The Court in *Gilbert* further cautioned that *how* an expert interprets and applies the data that the expert relies on in formulating an opinion is a pivotal consideration for the trial court in assessing the reliability of that testimony. The Court explained:

> When a court focuses its MRE 702 inquiry on the data underlying expert opinion and neglects to evaluate the extent to which an expert extrapolates from those data in a manner consistent with *Davis–Frye* (or now *Daubert*), it runs the risk of overlooking a yawning "analytical gap" between that data and the opinion expressed by an expert. As a result, ostensibly legitimate data may serve as a Trojan horse that facilitates the surreptitious advance of junk science and spurious, unreliable opinions.

> \* \* \*

> As shown, MRE 702 establishes preconditions for the admission of expert opinion. Such testimony must be rooted in "recognized *scientific*, technical, or other specialized *knowledge*" and must assist the trier of fact. The burden is on the party *offering* the expert to satisfy the preconditions established by MRE 702.

> Where the subject of the proffered testimony is far beyond the scope of an individual's expertise—for example, where a party offers an expert in economics to testify about biochemistry—that testimony is inadmissible under MRE 702. In such cases, it would be inaccurate to say that the expert's lack of expertise or experience merely relates to the weight of her testimony. An expert who lacks "knowledge" in the field at issue cannot "assist the trier of fact." [*Id*. at 783, 789 (emphasis in original).]

In the instant case, the trial court observed that while the Joint Commission standards that Hawkins relied on were not themselves reliable, Hawkins, without training as a physician or intensivist, used his professional experience as a hospital administrator and surgical technician to generate a more specific standard of care applicable to defendant in the implementation and development of the Code Blue policy. The trial court also correctly observed that Hawkins had not worked (1) in hospital administration in a Michigan hospital, (2) in a teaching hospital with residents, (3) and notably, had not carried primary responsibility for drafting a Code Blue policy for the ICU or a teaching hospital that is staffed with residents. Also persuasive in the trial court's analysis is that Hawkins's medical experience was limited to working as a surgical technician in the 1970s, and he did not work with medical practitioners in determining what he thought should be the standard of care applicable to defendant in its development and implementation of the Code Blue policy.

While relying on the Joint Commission standards to formulate his opinion concerning the standard of care, Hawkins expanded, beyond the four corners of the Joint Commission standards, on what he believed defendant was required to do to comply with the standard of care. Hawkins also conceded that the requirements of a Code Blue policy will vary depending on the size, needs, resources, and functionality of a hospital, and that such policies are drafted with the input and oversight of the physicians and nurses working in the departments to which the policies are applicable. However, Hawkins was not trained as a physician, had not worked in a Level II trauma

-9-

center or a teaching hospital staffed by residents, and his clinical experience was limited. In my view, without knowledge of a specific hospital's resources and staffing needs, Hawkins simply did not have the requisite knowledge to provide a reliable opinion regarding the implementation of a Code Blue policy at defendant's hospital. The trial court concluded that Hawkins's opinion was not reliable because of the significant gap between the Joint Commission standards and the opinion Hawkins expressed regarding the standard of care. Under these circumstances, the trial court's decision does not fall outside the range of reasonable and principled outcomes, and therefore, it did not constitute an abuse of discretion.

## II. NURSING MALPRACTICE CLAIM

I disagree with the majority that the trial court erred in dismissing plaintiff's nursing malpractice claim. Because I do not believe plaintiff has established the requisite element of causation, I would affirm.

The issue with plaintiff's nursing malpractice claim, as noted, is that plaintiff fails to present any evidence that the alleged breaches of the standard of cause were causally linked to Blackwell's death. In a medical malpractice action, a plaintiff is required to prove causation by a preponderance of the evidence. *Craig v Oakwood Hosp*, 471 Mich 67, 86; 684 NW2d 296 (2004). Proximate cause is a legal term of art that includes both cause-in-fact and proximate causation. *Id*. See also MCL 600.2912a(2). The plaintiff is required to put forth evidence that causally links the alleged breach in the standard of care to plaintiff's injuries in order to be successful. *Id*. at 90.

The issue, as I see it, with plaintiff's nursing malpractice claim is that plaintiff has failed to present any evidence that any breach in the standard of care by attending nurse Sara Enser, RN, was the proximate cause of Blackwell's death. In granting summary disposition in favor of defendant, the trial court examined the testimony of plaintiff's only two causation experts: Dr. Allen and Dr. Doblar. Dr. Allen offered the opinion that Blackwell's death occurred as "a result of having his trach tube dislodged, and . . . nobody [was] present who could, who was able to first understand the situation, and second to fix the situation." It was Dr. Allen's opinion that someone capable of adequately recognizing and addressing the situation, as well as someone capable of monitoring a freshly placed trach tube that could become dislodged, should have been available at all times. Similarly, Dr. Doblar further opined that the proximate cause of Blackwell's death was that the proper staff failed to response after Code Blue was called.

Neither of plaintiff's causation experts opined that defendant's nursing staff breached the standard of care, and that breach proximately caused Blackwell's death. Where plaintiff has failed to present any evidence that Blackwell's death was proximately caused by Ensor or any other nursing staff, plaintiff cannot establish the requisite element of causation to sustain a nursing malpractice claim, and summary disposition in favor of defendant was appropriate.

In reaching the contrary conclusion, the majority accepts the testimony of Kaisa Ring, RN, as expert witness testimony on the relevant standard of care for nurses, and further relies on King's testimony in concluding that a question of fact remained regarding causation. However, nowhere in Michigan jurisprudence has a court concluded that a nurse is permitted to testify concerning proximate causation in a nursing malpractice action. Additionally, the CJS Evidence, § 868, states:

Generally, while a registered nurse may possess the education and skill necessary to testify as to the standard of care of a patient's treating nurses, a nurse is not competent to testify as to the patient's cause of death; consequently, a medical doctor must still generally connect the patient's death to the alleged nursing deficiencies.

The majority fails to engage in any analysis on this issue, specifically whether nurses should be permitted to offer expert testimony to establish causation before relying on Ring's testimony to do just that. I would conclude that given Ring's education, training, and time spent as a registered nurse, and the language of MCL 333.17201(1)(c), which limits the scope of the practice of nursing, Ring was *not* qualified to provide a medical opinion concerning wehtehr the failure of defendant's nursing staff to engage in particular interventions were in the cause-in-fact and proximate cause of Blackwell's death. See MCL 333.17201(1)(c), which defines the practice of nursing as

> the systematic application of substantial specialized knowledge and skill, derived from the biological, physical, and behavioral sciences, to the care, treatment, counsel, and health teaching of individuals who are experiencing changes in the normal health processes or who require assistance in the maintenance of health and the prevention or management of illness, injury, or disability.

Additionally, MCL 333.17201(1)(e) further defines a registered professional nurse or "r.n." as

> an individual who is licensed under this part to engage in the practice of nursing which scope of practice includes the teaching, direction, and supervision of less skilled personnel in the performance of delegated nursing activities.

Compare with MCL 333.17001(1)(f), which defines a "physician" as "an individual who is licensed or authorized under this article to engage in the practice of medicine." Likewise, the practice of medicine is defined by MCL 333.17001(1)(j) as

> the diagnosis, treatment, prevention, cure, or relieving of a human disease, ailment, defect, complaint, or other physical or mental condition, by attendance, advice, device, diagnostic test, or other means, or offering, undertaking, attempting to do, or holding oneself out as able to do, any of these acts.

## III. CONCLUSION

On the basis of the foregoing, I would affirm the trial court's April 30, 2018 opinion and order, the trial court's May 3, 2018 supplemental opinion and order, and the trial court's September 27, 2018 opinion and order.

/s/ Kathleen Jansen

-11-