*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# S T A T E   O F   M I C H I G A N

# C O U R T   O F   A P P E A L S

ALEXANDRIA MARAE SCOTT,

      Plaintiff-Appellant,

v

SCHEURER HOSPITAL and JASON TERRANCE
WELLS, MD,

      Defendants-Appellees.

UNPUBLISHED
March 16, 2023

No. 361066
Huron Circuit Court
LC No. 19-105661-NH

Before: MURRAY, P.J., and RIORDAN and YATES, JJ.

PER CURIAM.

This medical-malpractice case arises from a laparoscopic cholecystectomy that defendant, Jason Terrance Wells, M.D., performed at defendant, Scheurer Hospital, on plaintiff, Alexandria Marae Scott. The trial court held an extensive evidentiary hearing to address defendants' challenge to plaintiff's expert witness, Dr. Francis Lee, under *Daubert v Merrell Dow Pharm, Inc*, 509 US 579; 113 S Ct 2786; 125 L Ed 2d 469 (1993), and its progeny. At the end of that hearing, the trial court concluded that "there is no doubt regarding Dr. Lee's qualifications" and "no question" about "his education, his background, [and] his experience," but his expert opinions were insufficiently reliable to be presented to the jury. See *Elher v Misra*, 499 Mich 11, 27-28; 878 NW2d 790 (2016). Thus, the trial court not only excluded expert testimony from Dr. Lee, but also awarded defendants summary disposition under MCR 2.116(C)(10) because, without testimony from Dr. Lee, plaintiff could not prove her case. We affirm in part, reverse in part, and remand for further proceedings.

## I. FACTUAL BACKGROUND

On June 7, 2017, plaintiff went to Scheurer Hospital suffering from nausea and abdominal pain. Plaintiff was diagnosed with acute cholelithiasis (meaning formation of gall stones) and then she was admitted to the hospital for a laparoscopic cholecystectomy (meaning surgical gallbladder removal), which Dr. Wells performed on June 8, 2017. After the operation, plaintiff still suffered from pain, which turned out to be the result of a biliary obstruction (meaning a blockage of tubes that carry bile from the liver to the gallbladder and small intestine). As a result, on June 26, 2017, plaintiff underwent a laparotomy (meaning a surgical incision into the abdominal cavity) to locate

and treat the obstruction and a leak. That procedure revealed that plaintiff's common hepatic duct (meaning a tube that carries bile from the liver) was occluded (meaning obstructed) "with a clip." During his deposition, Dr. Wells admitted that "[t]here was quite a bit of inflammation, quite a bit of swelling, and I'm sure during the removal of the gallbladder from the fossa that I inadvertently must have placed that clip[.]"

On December 6, 2019, plaintiff filed a complaint for medical malpractice against Dr. Wells and Scheurer Hospital alleging that, during the surgery to remove plaintiff's gallbladder, Dr. Wells "negligently caused iatrogenic injury [meaning illness caused by medical treatment] to one or more ducts in the surgical field." The complaint further alleged that "[t]he iatrogenic injury resulted in accumulation of and leakage of bile." More specifically, the complaint stated that "during surgery Dr. Wells negligently placed a surgical clip on the common hepatic duct[,] [w]hich led to infection and other complications." The complaint included an "affidavit of meritorious claim" prepared by plaintiff's expert, Dr. Lee, who stated that Dr. Wells had "negligently placed a surgical clip on the common hepatic duct causing infection" and breached the standard of care by causing "iatrogenic injury to one or more of the ducts in the surgical field."

On June 10, 2021, defendants filed a "motion for summary disposition, or in the alternative, for [a] *Daubert* hearing." Defendants reasoned that, because Dr. Lee's "testimony is objectionable and not admissible, summary disposition is, therefore, appropriate." Defendants relied upon MRE 702 and MCL 600.2955 in contesting the admissibility of Dr. Lee's proposed testimony. The trial court conducted a *Daubert* hearing that spanned three days—October 7, 2021, November 18, 2021, and January 4, 2022. At the conclusion of that hearing, the trial court granted defendants' request to exclude *in toto* the proposed expert testimony of Dr. Lee as insufficiently reliable to be presented to a jury. After rendering that ruling, the trial court granted summary disposition to defendants as a byproduct of its exclusion of plaintiff's expert witness, whose testimony was an essential part of plaintiff's claim for medical malpractice. Plaintiff unsuccessfully moved for reconsideration, and then she filed this appeal.

## II. LEGAL ANALYSIS

The trial court resolved the case by granting summary disposition under MCR 2.116(C)(10) to defendants on plaintiff's medical-malpractice claims. We review do novo the decision on the motion for summary disposition. *El-Khalil v Oakwood Healthcare, Inc*, 504 Mich 152, 159; 934 NW2d 665 (2019). But the summary disposition motion hinged upon the decision to exclude Dr. Lee's testimony, so we shall first consider plaintiff's challenge to that ruling. We review the trial court's decision to exclude evidence for an abuse of discretion. *Elher*, 499 Mich at 21. "An abuse of discretion occurs when the trial court chooses an outcome falling outside the range of principled outcomes." *Id*. "We review de novo questions of law underlying evidentiary rulings, including the interpretation of statutes and court rules." *Id*. "The admission or exclusion of evidence because of an erroneous interpretation of law is necessarily an abuse of discretion." *Id*. Employing these standards, we must decide whether the trial court properly excluded Dr. Lee's testimony.

### A. THE *DAUBERT* CHALLENGE

As a general rule, " 'expert testimony is required in a malpractice case in order to establish the applicable standard of care and to demonstrate that the professional breached that standard.' "

*Id*. Plaintiff proffered Dr. Lee to furnish that expert testimony for her. But defendants challenged Dr. Lee's proposed testimony as inadmissible under MRE 702 and MCL 600.2955. The trial court then conducted a *Daubert* hearing where Dr. Lee and two experts on behalf of defendants testified. Not surprisingly, the testimony of defendants' experts—Dr. John Webber and Dr. Linda Bailey— differed from Dr. Lee's testimony on significant issues. Dr. Lee testified that Dr. Wells breached the standard of care in five respects: (1) Dr. Wells failed to order an ultrasound in addition to a CT scan before the surgery; (2) Dr. Wells failed to call for assistance to address bleeding during the surgery; (3) Dr. Wells failed to convert from a laparoscopic procedure to an open procedure when the surgery required that change; (4) Dr. Wells failed to perform an intraoperative cholangiogram involving injection of contrast dye during the surgery; and (5) Dr. Wells failed to order laboratory tests after the surgery. The trial court excluded Dr. Lee's proposed expert testimony on all five of the purported shortcomings as unreliable, so we must address each of the five subjects in turn.[1]

The standards for deciding the admissibility of expert testimony on each of the five subjects are set forth in MRE 702 and MCL 600.2955. According to MRE 702, a proposed expert witness may testify "in the form of an opinion or otherwise if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." In this language, "MRE 702 has imposed an obligation on the trial court to ensure that any expert testimony admitted at trial is reliable." *Gilbert v DaimlerChrysler Corp*, 470 Mich 749, 780; 685 NW2d 391 (2004). " 'Under MRE 702, it is generally not sufficient to simply point to an expert's experience and background to argue that the expert's opinion is reliable and, therefore, admissible.' " *Elher*, 499 Mich at 23. Also, "[a] lack of supporting literature, while not dispositive, is an important factor in determining the admissibility of expert witness testimony." *Id*.

Beyond MRE 702, defendants rely upon MCL 600.2955(1), which prescribes seven factors that trial courts must consider before admitting proposed expert testimony as reliable in a medical-malpractice case:

> (a) Whether the opinion and its basis have been subjected to scientific testing and replication.
>
> (b) Whether the opinion and its basis have been subjected to peer review publication.

---

[1] Dr. Lee became board-certified in the field of general surgery in 1996, and he has been recertified twice. He is "a full-time general surgeon" who maintains "an office practice three days out of the week, and then surgery on a daily basis" at Sutter Coast Hospital in Crescent City, California. Dr. Lee testified that he has "performed over 3,000, if not 4,000, laparoscopy cholecystectomies." On the basis of that background, the trial court had "no doubt regarding Dr. Lee's qualifications in the field" and "no question [about] his education, his background, [and] his experience." Accordingly, the *Daubert* hearing focused exclusively upon the reliability of Dr. Lee's opinions in this case.

(c) The existence and maintenance of generally accepted standards governing the application and interpretation of a methodology or technique and whether the opinion and its basis are consistent with those standards.

(d) The known or potential error rate of the opinion and its basis.

(e) The degree to which the opinion and its basis are generally accepted within the relevant expert community. As used in this subdivision, "relevant expert community" means individuals who are knowledgeable in the field of study and are gainfully employed applying that knowledge on the free market.

(f) Whether the basis for the opinion is reliable and whether experts in that field would rely on the same basis to reach the type of opinion being proffered.

(g) Whether the opinion or methodology is relied upon by experts outside of the context of litigation.

To be sure, "all the factors in MCL 600.2955 may not be relevant in every case." *Elher*, 499 Mich at 26. But the admissibility of Dr. Lee's proposed testimony turns upon whether his opinions are "sufficiently reliable under the principles articulated in MRE 702 and by the Legislature in MCL 600.2955." *Id*. at 24.

In *Elher*, our Supreme Court applied the standards from MRE 702 and MCL 600.2955(1) to proposed expert testimony in a medical-malpractice case involving the same surgical procedure at issue in this case, i.e., "a laparoscopic cholecystectomy (removal of the gallbladder)" in which the surgeon "inadvertently clipped the common bile duct leading from plaintiff's liver, resulting in plaintiff having to undergo emergency surgery to remove the clip and repair the duct so that bile could again drain from her liver." *Id*. at 14-15. The Supreme Court held that "the circuit court did not abuse its discretion by excluding [the proposed expert]'s testimony" because he "admitted that his [expert] opinion was based on his own personal beliefs, there was no evidence that his opinion was generally accepted within the relevant expert community, there was no peer-reviewed medical literature supporting his opinion," and "defendant submitted contradictory, peer-reviewed medical literature[.]" *Id.* at 14. Using those criteria as a template for our analysis, we must consider each of the five grounds that Dr. Lee identified in opining that Dr. Wells breached the standard of care in his treatment of plaintiff.[2]

## 1. FAILURE TO ORDER AN ULTRASOUND

Dr. Lee stated that Dr. Wells breached the standard of care by failing to order an ultrasound before performing surgery on plaintiff. Specifically, Dr. Lee faulted Dr. Wells for relying upon a CT scan when plaintiff had a history of gallbladder problems and likely had chronic inflammation and adhesions, which would limit a surgeon's vision and make laparoscopic surgery difficult. As Dr. Lee stated, "it is a standard of care for general surgeons before embarking on a laparoscopy

---

[2] The parties seem to agree that Dr. Wells, as a board-certified general surgeon, is a specialist under MCL 600.2169, and therefore a national standard of care applies.

surgery to insist and obtain an ultrasound before the surgery." But Dr. Lee acknowledged that the CT scan "discovered the gallstones in the gallbladder" and also revealed "that the gallbladder was inflamed[.]" In addition, Dr. Lee conceded that Dr. Wells's "choice of performing the laparoscopy cholecystectomy was appropriate at the time." But Dr. Lee said that there was "a chance that [Dr. Wells] should have done further studies to make sure that it was a safe surgery." On that matter, Dr. Lee explained that the "CT scan is not the real gold standard" for gallbladders. Instead, "it's an ultrasound[,]" which "would have definitely helped [Dr. Wells] to be prepared much better" for the surgery by better seeing "whether there is a thickened gallbladder wall," "whether there was a viable common bile duct and how big that is, whether there is a portal vein, [and] if there was an aberrant hepatic artery or right hepatic duct that is close to the cystic duct[.]"

The trial court rejected Dr. Lee's opinion on CT scans and ultrasounds as unreliable, stating that "this goes back to this Dr. Way article" in which "I don't see anything relative to an ultrasound should have been performed instead of a CT" scan. That article, written by Lawrence Way, M.D., and other doctors and bearing the title "Causes and Prevention of Laparoscopic Bile Duct Injuries," "analyzed 252 laparoscopic bile duct injuries" and found that "[t]he primary cause of error in 97% of cases was a visual perception illusion." The article noted that "[b]ile duct injuries are the main serious technical complication of laparoscopic cholecystectomy." But in their analysis of injuries of that nature, Dr. Way and his colleagues did not mention the benefits of ultrasounds. Moreover, as the trial court noted, an article on Mirizzi syndrome (meaning common hepatic duct obstruction caused by extrinsic compression from an impacted stone in the cystic duct or infundibulum of the gallbladder) found the "sensitivity of abdominal ultrasound in the diagnosis of Mirizzi syndrome is 23 to 46 percent[,]" whereas "the sensitivity and specificity of abdominal CT for the diagnosis of Mirizzi syndrome were 42 and 99 percent, respectively." That article fortifies the trial court's concern about Dr. Lee's testimony that the standard of care mandated an ultrasound instead of (or in addition to) the CT scan that plaintiff underwent before surgery. Accordingly, we conclude that the trial court did not abuse its discretion in precluding Dr. Lee from providing his proposed expert testimony about CT scans and ultrasounds.

## 2. FAILURE TO CALL FOR ASSISTANCE TO ADDRESS BLEEDING

Dr. Lee opined that Dr. Wells breached the standard of care by failing to call for assistance to deal with plaintiff's extensive bleeding during the surgical procedure. Dr. Lee referred to "brisk bleeding" and said that, "[w]hen there is a bleeding of such, you have to do either [of] two things." That is, "you tamponade the bleeding to buy some time [and] you have to call out for some help." As Dr. Lee explained, "as a standard of care, you should be reaching out for somebody for a second opinion to come in and assist when you get into trouble." But the trial court contrasted the teaching hospital where Dr. Lee works with defendant, Scheurer Hospital, which is not a teaching hospital. The trial court implied that there was no other physician whom Dr. Wells could call for help in the middle of the surgical procedure. Thus, the trial court did not furnish any findings before barring Dr. Lee's testimony about Dr. Wells's failure to call for assistance. But findings were unnecessary because, when Dr. Lee was confronted at the *Daubert* hearing about the lack of assistance available to Dr. Wells, plaintiff's counsel told the trial court that "I'll stipulate that that's not a claim that he should call in someone that's not there. I'll stipulate to that." Plaintiff's counsel's stipulation took the issue of calling for assistance out of play. Accordingly, the trial court did not commit an abuse of discretion in precluding Dr. Lee from testifying about Dr. Wells's failure to call for help during the surgical procedure.

### 3. FAILURE TO CONVERT TO AN OPEN PROCEDURE

Dr. Lee testified that Dr. Wells breached the standard of care by failing to convert from the laparoscopic procedure to an open procedure to complete the surgery. As defendants explained in their brief, "[a] laparoscopic procedure is such that the surgeon is able to magnify the visual field, but the surgeon is seeing the area in two dimensions. An open procedure allows three dimensional visualization and feel by the surgeon but carries with it additional risks of a much larger incision." In *Ehler*, our Supreme Court observed that *defendants* filed "affidavits from several experts and at least one peer-reviewed publication supporting their opinions that clipping the common bile duct is a known potential complication of laparoscopic cholecystectomy because of the lack of depth perception on the two-dimensional video monitor used to view the area while performing the surgery." *Ehler*, 499 Mich at 17. In other words, the very mistake that Dr. Wells made here during the surgery on plaintiff is a known potential complication of a laparoscopic cholecystectomy. *Id.* Predictably, there is a wealth of scientific writing discussing the importance of converting from a laparoscopic procedure to an open procedure when performing a cholecystectomy.

In a 2012 article written by Dr. Viet H. Le, M.D., and others and published in The American Surgeon that is entitled "Conversion of Laparoscopic to Open Cholecystectomy in the Current Era of Laparoscopic Surgery," Dr. Le and his colleagues state: "Conversion to open cholecystectomy is not a sign of failure but should be viewed as a safe alternative in difficult situations." Difficult situations that require intraoperative conversion include "inflammation," "adhesions," "anatomic difficulty," and "bleeding[.]" Similarly, a 1994 paper published by Jeffrey H. Peters, M.D., FACS, and others in The American Journal of Surgery called "Reasons for Conversion from Laparoscopic to Open Cholecystectomy in an Urban Teaching Hospital" says that laparoscopic cholecystectomy "can be successfully performed the majority of the time," but "there remains a significant number of patients who require conversion to open cholecystectomy." Dr. Peters and his colleagues state that "[t]he most common reason for conversion to open cholecystectomy was difficult dissection secondary to dense adhesions, severe inflammation, or obscure anatomy." Further, interoperative complications in the form of bleeding necessitated conversion to an open procedure because "[a]ll bleeding was easily controlled with laparotomy" (meaning a surgical incision into the abdominal cavity). Finally, "[p]atients admitted with acute symptoms were eight times more likely to require conversion to open cholecystectomy than were those without."

Plaintiff exhibited nearly all of the risk factors discussed in the Le and Peters publications. First, the emergency room report and the operative report noted a diagnosis of acute cholecystitis severe enough to prompt her immediate admission to the hospital and the scheduling of a surgical procedure. Second, the findings in the operative report included "a severely inflamed gallbladder . . . along with fairly large blood vessels that were adhered to the area secondary to longstanding inflammation." Third, Dr. Wells testified at his deposition that, during the surgical procedure that he performed laparoscopically, "[t]here was bleeding associated with the liver that wasn't stopping with direct pressure[.]" Dr. Wells summarized that the surgery he performed on plaintiff "was by far one of the most difficult gallbladders I've done" because "inflammation was an issue, the size of the gallbladder was an issue[,]" and "[t]here was quite a few things that made that difficult." Dr. Wells conceded that "[n]obody intentionally would place a clip on [the common hepatic] duct." Nevertheless, he acknowledged that "[t]here was quite a bit of inflammation, quite a bit of swelling and I'm sure during the removal of the gallbladder from the fossa that I inadvertently must have placed that clip" on the common hepatic duct.

Defendants point out that the operative report reflects a laparoscopic cholecystectomy that ended "without [plaintiff] suffering any adverse events." But in the fullness of time, a laparotomy performed on June 26, 2017, to address an obstruction and a leak revealed that plaintiff's common hepatic duct was occluded "with a clip." Dr. Wells's failure to detect that problem in surgery was a perfectly predictable result of his failure to convert to an open procedure in response to difficult conditions. A 1993 article written by Vivian S. Lee, M.D., and others published in The American Journal of Surgery called "Complications of Laparoscopic Cholecystectomy" emphatically directs that "[w]hen bleeding is difficult to control, conversion to open cholecystectomy is required." The reason for that directive is explained in clear terms by the authors. "A classic mechanism of injury has been recognized in the majority of laparoscopic bile duct injuries." "This mechanism consists of misidentification of the common bile duct or common hepatic duct as the cystic duct during the initial dissection." But when that mistake occurs, "[m]ost major bile duct injuries are not detected intraoperatively because of the basic misconception." Significantly, though, an "exception occurs occasionally after the operation is converted to open cholecystectomy." In other words, converting to an open procedure is the method for detecting the mistake that Dr. Wells made in this case.

Dr. Lee testified that, when a surgeon encounters uncontrolled bleeding while performing a laparoscopic cholecystectomy, "standard of care would be to convert to open cholecystectomy" so that the surgeon "will know and identify exactly all the anatomical details to make sure that you do not cause any major problems." Dr. Wells conceded that, during plaintiff's surgery, he had to deal with "bleeding associated with the liver that wasn't stopping with direct pressure[.]" He also confronted other risk factors, such as "quite a bit of inflammation, quite a bit of swelling." Thus, Dr. Lee's opinion on the standard of care requiring conversion to an open procedure was grounded in facts, not supposition, and his opinion was congruent with a wealth of published authority. We conclude, therefore, that the trial court abused its discretion by barring Dr. Lee's expert testimony on conversion to an open procedure.

### 4. FAILURE TO PERFORM AN INTRAOPERATIVE CHOLANGIOGRAM

Dr. Lee concluded that Dr. Wells breached the standard of care by failing to perform an intraoperative cholangiogram during the laparoscopic procedure. As Dr. Lee put it, intraoperative cholangiography means "inserting a needle or inserting a plastic catheter into various places above the common bile duct or common hepatic duct, usually by making a small incision where you think the cystic duct is." Then "you can inject a contrast dye that you can see on x-ray." "[B]y injecting this contrast dye and then visualizing it, you can actually see where . . . there is a common hepatic duct, where the common bile duct is, where the cystic duct is." But Dr. Lee hedged on the standard of care for performing an intraoperative cholangiogram, stating that "I cannot really attest whether there is a standard of care directly attributed to the intraoperative cholangiogram." Consequently, although the Way article proposes, as a rule of thumb, that good surgeons should "obtain operative cholangiograms liberally whenever the anatomy is confusing or when inflammation and adhesions result in a difficult dissection[,]" the trial court did not abuse its discretion in barring Dr. Lee from testifying about a standard of care to which he could not attest.

### 5. FAILURE TO ORDER POST-OPERATIVE LABORATORY TESTS

Dr. Lee testified that Dr. Wells breached the standard of care by failing to order laboratory tests for plaintiff after surgery. Specifically, Dr. Lee explained that "the postoperative note by Dr.

Wells clearly delineates that there were no labs or any other test that was ordered." Dr. Lee said: "I believe that that is below the standard of care for this particular case." The cross-examination of Dr. Lee asked if "there's no peer-review literature you're aware of that indicates that a general surgeon must order postop labs in a situation where he does not think there's a problem, true?" In response, Dr. Lee acknowledged that "I do not know of any article that states the standard of care is that you have to order all these" tests. Because the operative notes reflect no concerns Dr. Wells had after he finished the surgery, the trial court did not abuse its discretion in precluding Dr. Lee from testifying about Dr. Wells's failure to order post-operative testing for plaintiff.

## B. SUMMARY DISPOSITION

The trial court's summary disposition award under MCR 2.116(C)(10) flowed inexorably from the exclusion of Dr. Lee's proposed expert testimony. In *Elher*, our Supreme Court approved the trial court's decisions to bar the testimony of plaintiff's expert as unreliable and grant summary disposition because of the lack of expert testimony supporting the plaintiff's case. *Ehler*, 499 Mich at 18, 28. Our Supreme Court pointed out that, as a general matter, " 'expert testimony is required in a malpractice case in order to establish the applicable standard of care and to demonstrate that the professional breached that standard.' " *Id*. at 21. Here, however, we have decided that, in one respect, the trial court abused its discretion in excluding Dr. Lee's expert testimony. Accordingly, the foundation for the trial court's award of summary disposition to defendants no longer remains in place, so we must reverse the trial court's summary disposition award and remand the case for further proceedings.

Affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion. We do not retain jurisdiction.

/s/ Christopher M. Murray
/s/ Michael J. Riordan
/s/ Christopher P. Yates

-8-